MARIA S. WHITAKER ET AL. V. THE ERIE SHOOTING CLUB· AND JAY W. KEENEY.

*Adverse possession—Marsh land.*

1. The requirements of an adverse possession necessary to establish title to real estate are well understood, but the difficulty arises in applying these requirements to the particular case, which, as a rule, must be controlled by its own facts and circumstances.

2. The established rule of this Court is that "it is sufficient if the

acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question" (*Murray v. Hudson*, 65 Mich. 670, 673); that the occupation need not be such as to inform a passing stranger that some one is asserting title; that if it be such as to notify and warn the owner, should he visit the premises, that a person is in possession under a hostile claim, it is sufficient.

3. Complainant's ancestor, in 1837, purchased a piece of marsh land near one of the Great Lakes, which land was at times entirely submerged by the waters thereof. The principal use of which the land was capable, aside from cutting the hay growing around a sulphur spring thereon, was for hunting birds. The ancestor died in 1890. For ten years prior to his death, he lived within 40 miles of the land, but never exercised any acts of possession over the same. January 16, 1860, a tax deed was executed by the State for the taxes of 1857, and was recorded the same year, and thereafter the land was assessed to the grantees, who paid the taxes, and who were understood by all living in the neighborhood to be the owners of the land. In May, 1879, one of the grantees leased his half of the land to a shooting club. The lease was recorded in 1880. The lessee caused signs to be posted at various places around the land, upon which was painted a notice that the land belonged to the club, and that all trespassers would be prosecuted. At the expiration of this lease a similar one was executed by a grantee of the same lessor to another shooting club, and recorded. During the occupancy by these clubs, said signs were placed in position every spring, and taken up every fall, because the ice would carry them away. Watchmen were also employed during the shooting season to keep off trespassers. All of these acts of possession were continued from 1880 up to 1893, when complainants filed a bill to set aside said tax deed and the last-mentioned lease as a cloud upon their title. The lessor answered the bill, claiming title by adverse possession, and asking that his title be affirmed. And, in affirming a decree granting said affirmative relief, it is held:

a—That, while it may well be conceded that paying taxes, or asserting title, or the common understanding in the neighborhood, or making surveys, or an occasional renting for trapping and shooting, was not sufficient to establish title by adverse possession, yet such acts were all competent evidence to be considered in determining the question.

b—That the notices which were posted around the land from early in the spring till late in the fall, every year for 12 successive years, were notice of an adverse title and possession;

that the owner, if he had visited the land, could not have failed to understand their meaning, as they were inconsistent with his rights as the original owner of the fee.

Appeal from Monroe. (Kinne, J.) Argued October 4, 1894. Decided November 20, 1894.

Bill to quiet title. Complainants appeal. Decree affirmed. The facts are stated in the opinion.

*Willis Baldwin* (*Ira G. Humphrey,* of counsel), for complainants.

*De Forest Paine,* for defendant Erie Shooting Club.

*Ira R. Grosvenor,* for defendant Keeney.

GRANT, J. The complainant Maria S. Whitaker is the widow, and the other complainants are the heirs at law, of Harry Whitaker, deceased, who died in June, 1890. Harry Whitaker purchased the land in question in 1837. The object of the bill is to remove a cloud from complainant's title, caused by a tax deed made by the State of Michigan, January 16, 1860, to Elias W. Hedges and Andrew J. Keeney for the taxes of 1857, a deed from Andrew J. Keeney to Jay W. Keeney, dated August 14, 1889, and a lease executed by Jay W. Keeney to the Erie Shooting Club, August 28, 1889. The defendant Keeney answered, claiming title by adverse possession, and asking affirmative relief, affirming his title. The shooting club answered, admitting the execution of the lease and its incorporation, and leaving complainants to their proofs on their other allegations.

*The Situation and Character of the Land:*

The land is a piece of marsh situated in the south-east corner of Monroe county, about 120 rods from the mainland, on the west, and a mile from the sea wall of the shore of Lake Erie, on the east. Between it and the

mainland is mud, which is at times covered with water. Upon it is a large sulphur spring. Around the spring the land is a little higher, and, on a few acres, grows hay fit for use. At low water the land around this spring is from a foot and a half to two feet above the water. When the wind blows from Lake Erie the land is entirely submerged. The only way to reclaim it, so as to render it fit for cultivation, would be the erection of a dike around it, several feet high. The only use to which it can ever be put, aside from the cutting of the hay around the spring, is for hunting birds, muskrats, and mink, but its principal use is for hunting birds.

### Abandonment by Complainants' Ancestor:

From 1837 to 1892 neither the complainants nor their ancestor exercised any act of possession. For 10 years prior to his death Harry Whitaker lived in Detroit, 40 miles distant. Maria S. Whitaker testified on behalf of the complainants as follows:

"*Q.* Do you know what became of his property?

"*A.* Well, it was overflowed. We had nothing to do with it.

"*Q.* What did you do with this spring lot?

"*A.* I don't know as anything. We all supposed it went. We considered it all lost. We thought it wasn't worth anything.

"*Q.* And you abandoned it?

"*A.* Yes.

"*Q.* You never paid any taxes on it?

"*A.* No, sir, I think not. I never knew any being paid.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* When did you first know your husband left this property?

"*A.* I knew he bought it at the time, but, as I say, we had given it up. It was overflowed, and we supposed it was worth nothing. I don't suppose he knew it was worth anything."

Prior to 1860 the land was sold for taxes to various parties, who took no steps to obtain possession.

*Defendants' Connection with the Land:*

Mr. Hedges and Andrew J. Keeney knew that Mr. Whitaker had abandoned the land at the time of the purchase of the tax title. Their tax deed was placed upon record January 30, 1860. From that time to the present the taxes were assessed to and paid by them. Hedges and Keeney leased the right to trap upon the premises to various parties every year, some years receiving $4 or $5; some, $12 or $15; and other years receiving nothing. They also caused some willows to be planted near the spring, and occasionally cut hay. No other acts of actual possession are shown, except that they occasionally went to the land to look after it, as owners of land usually do. From 1860 to the commencement of this suit, it was understood by all living in the neighborhood that this was the property of Hedges and Keeney. On May 8, 1879, Andrew J. Keeney executed to the Bay Pointe Shooting Club a lease of the undivided half interest of the land, which interest is now the sole subject of controversy here, for the purpose of hunting and shooting snipe, wilk fowls, and all other birds recognized as game by the laws of the State, and for all other purposes necessary and incident thereto, and for no other use or purpose. This lease was recorded November 15, 1880. This club immediately caused signs to be painted, and posted at various places around this land the following notice:

" Lands of Bay Pointe Shooting Club. All Trespassers will be Prosecuted.     [Signed]
                    " A. J. KEENEY, President."

At the termination of that lease, and on August 28, 1889, Jay W. Keeney executed a similar lease to the Erie Shooting Club, which was recorded March 22, 1890. During the occupancy by these clubs, these signs were placed in position every spring, and taken up every fall, because the ice would carry them away. Watchmen were

also employed to keep off trespassers during the shooting season. These acts of possession continued from 1880 to the commencement of this suit, in 1893.

The requirements of an adverse possession necessary to establish title to real estate are well understood. The difficulty arises in applying these requirements to each case as it arises. Each case, as a rule, must be controlled by its own facts and circumstances. The established rule of this Court is:

"It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question." *Murray v. Hudson,* 65 Mich. 670, 673.

The occupation need not be such as to inform a passing stranger that some one is asserting title. If it be such as to notify and warn the owner, should he visit the premises, that a person is in possession under a hostile claim, it is sufficient. After long and intentional abandonment by the owner in this case, those under whom the defendants claim obtained a tax deed from the State of Michigan. They immediately placed this on record. This, of itself, was a sufficient disseisin to support an action of ejectment by the original owner. *Hoyt v. Southard,* 58 Mich. 434. The defendant at once commenced to exercise such acts of possession and ownership as were consistent with the character of the land. Evidence of the general understanding in the neighborhood that he was the owner, and that it was called his, was held competent, as tending to establish the notoriety of defendant's possession and claim of title. *Sparrow v. Hovey,* 44 Mich. 63. *Pedes possessio* is not indispensable. The land need not be fenced. Buildings are not necessary. Where the possession claimed was by cutting grass and pasturing cattle each year during the season, and planting trees, it was held to be evidence of

a practically continuous, exclusive, and hostile possession. *Sauers v. Giddings*, 90 Mich. 50. Openly and notoriously claiming and using land in the only way it could be used without fencing or cultivation was held to establish adverse possession. *Curtis v. Campbell*, 54 Mich. 340. Cropping land, though no one was actually upon it, and nothing done thereon, between harvest and recropping, was held to establish adverse possession. *Cook v. Clinton*, 64 Mich. 309.

It may well be conceded that paying taxes, or asserting title, or the common understanding in the neighborhood, or making surveys, or an occasional renting for trapping and shooting, is not sufficient to establish title by adverse possession. But they are all competent evidence to be considered in determining the question. The notices which were posted around this land from early in the spring till late in the fall, every year for 12 successive years, were notice of an adverse title and possession. The owner, if he had visited it, could not have failed to understand their meaning. They were inconsistent with the rights of the original owner of the fee. The land was then valuable for little else than shooting. Mr. Whitaker lived within 40 miles of this land for 10 years, with these open, notorious assertions of title and possession posted around the land from early in the spring till late in the fall. This substantially covered all the time during which this land could be used for any purpose except for hunting muskrats. The notice denied all right to use unless authorized by the club.

We need not discuss the question of possession prior to the lease of the Bay Pointe Shooting Club. Ten years' adverse possession under the tax deed is sufficient.

The decree will be affirmed.

The other Justices concurred.