MARANDA V. DICE, *et al.*, Appellants, v. M. L. BROWN, *et al.*

Quieting Title: LACHES.  In an action to quiet title to land which had belonged to plaintiff's husband and which his adminstrator had sold illegally, it appeared that upon his death, the description of the land had been turned over to his administrator; that afterward plaintiff, and others for her, had at various times from 1862 to 1893, written to the administrator and others for information regarding the location of the land, but could learn nothing; that they had applied to the general land office and to the state land office without success, and finally had obtained the description by writing to county officials in that part of the state where the land was supposed to lie.  Neither the widow, nor the children, who were minors, knew of the land until after the death of the husband and father, and then only as "320 acres in Iowa."  *Held*, that there had not been laches on the part of the plaintiff, estopping her from maintaining her action to quiet title, though more than twenty years elapsed before suit was begun.

ADVERSE POSSESSION.  Continuous occupation of prairie or grazing land held under claim of title by the claimant and his tenants

during the grazing season of each year, is sufficient to support a claim of adverse possession, where they cut the grass upon it and made hay therefrom, and kept other persons and their stock away from the land, even though it was not plowed or fenced and the claimant did not actually reside upon it.

*Appeal from Palo Alto District Court.*—HON. GEORGE H. CARR, Judge.

## MONDAY, MAY 18, 1896.

ACTION in equity to confirm in the plaintiffs the title to certain real estate, and to quiet that title as against the defendants. There was a hearing on the merits, and a decree for the defendants. The plaintiffs appeal.—*Affirmed.*

*C. E. Cohoon* and *L. W. Welker* for · appellants.

*A. C. Parker* for appellees.

ROBINSON, J.—In August, of the year 1858, Ephraim D. Johnson, a resident of the state of Ohio, died testate, seized in fee simple of the southwest quarter of section 2, and the southeast quarter of section 3, in township 94, north of range 34 west, in Palo Alto county. His wife, Maranda V. Johnson, and his children, Mary J., George E., and Lillie L. Johnson, survived him, and the land described was devised to them. His widow afterward married one Dice, who is now dead. Mary J. married a man named Harkless. Lillie L. married Alonza L. Wright, by whom she had two sons, Clyde L. and C. Leroy Wright, and died intestate in January, 1883. The plaintiffs are, the widow, Maranda V. Dice, Mary J. Harkless, George E. Johnson, and Alonzo L., the surviving husband, and Clyde L. and C. Leroy, the minor children of Lillie L. Wright, deceased. They claim to be the absolute owners of the land in question. Gideon H. Ward and

James Anderson were appointed administrators of the estate, in Ohio, of the decedent, Johnson, and duly qualified, and entered upon the discharge of the duties of the office to which they were appointed. In March, 1862, they filed a report of their proceedings, which showed that the estate was insolvent; that there were debts against it unpaid, which amounted to more than one thousand dollars, and that the property available for the payment had been exhausted, "except three hundred and twenty acres of land in Iowa." In May, 1862, the report was, in the main, approved, by the proper probate court, and a balance of eighteen dollars and thirty-seven cents found to be due the administrators. They were not in terms discharged, although the records of that court do not show that any further action was had. However, in June, 1864, Ward filed in the probate court of Palo Alto county an application for the appointment of Theodore Hawley as administrator of the land in that county. Hawley duly qualified as administrator, and in September, 1868, he filed an application for an order to sell the land in question. The application recited that administration of the estate of the decedent had been granted in Ohio; that the personal property had been exhausted, and that debts amounting to more than one thousand dollars were unpaid. An order for the sale of the land was made. It was appraised at three hundred and twenty dollars, and sold to Ward at private sale for four hundred dollars. The defendants claim title to the land through the Hawley sale, and the decree of the district court quieted the title in them.

I. It is not contended by any one that the deed executed by Hawley was valid. No notice of any kind, of the application to sell the land was given, and Ward, being an administrator of the estate, could not rightfully purchase it. But the sale does

not appear to have been made with any wrongful intent. Ward had advanced money on account of the land, which had not been repaid. Hawley tried for years to find a purchaser, but without success, and finally induced Ward to purchase the land for about what it was worth. After paying the expenses incurred in procuring administration in this state and in making the sale, and refunding the taxes advanced, nothing of the purchase price remained to Ward. He claims to have made a verbal report of the matter to the proper probate judge in Ohio, and to have been told that, as nothing remained from the sale for the estate, a formal report was not necessary, and none was made. The Hawley conveyance was invalid, and nothing can be claimed for it excepting that it gave to the defendants the foundation upon which their alleged right of possession and ownership is based.

II. It is said that the laches of the plaintiffs in asserting and protecting their title has been so great that a court of equity should not lend them its aid. The widow of Johnson has been competent to protect her interests at all times since his death. Of his children, Mary attained her majority in April, 1871, George in July, 1878, Lillie in December, 1872; and during their minority their mother seems to have been somewhat active in trying to ascertain and protect the interests of herself and her children. There is some conflict in the evidence, but we think it establishes the following facts: Soon after Ward qualified as an administrator of the estate of the decedent, Mrs. Johnson gave to him valuable papers, including certificates showing the purchase from the general government of the land in controversy, and never saw them again. The will was never recorded, and nothing which remained in her possession, and nothing contained in the probate records of the estate, showed

what land in Iowa belonged to the estate. Mrs. Johnson learned for the first time when her husband died that he owned land in this state, but did not know its description, nor the part of the state in which it was located. The probate records showed only that there were three hundred and twenty acres of land in this state. In the year 1865, she wrote to Ward in regard to the land and other matters pertaining to the estate. He answered the letter in June of that year, and wrote: "I think the western land will not more than pay expenses. I had to pay a few months ago, $137.00 taxes. That, with the other expenses attending it, I fear will make more that I can get for the land." Mrs. Dice states that she afterwards wrote numerous letters to Ward in regard to the land, inquiring as to its location and for other facts, but that Ward refused to answer the letters. In 1877, Alonzo L. Wright, who had married Lillie, visited the county where Johnson had resided, examined the probate records, and attempted to obtain information in regard to the land, but without success. In the year 1883, John A. Harkless, the husband of Mary, employed counsel, and attempts were made to procure from the government land offices at Washington and in this state, information in regard to the land purchased by Johnson, but without success. An attorney in Chariton, in this state, was employed in the search, but without results. Finally, in May, 1893, Harkless obtained a letter from Ward, in which he stated that the land was some sixty miles northwest of Ft. Dodge, but did not otherwise describe it, nor state that it had been sold, although he expressed regret that the land warrants did not more than pay expenses, and stated that the land warrant business was a failure, and left him "minus several hundred dollars." Harkless again wrote to Ward, asking for a description of the land, but received an answer in

which Ward stated that he had no recollection whatever in regard to the matter. Harkless then wrote to several auditors in the counties in that part of the state in which he was led by Ward's first letter to believe the land might be located, and in the latter part of July, 1893, received a letter from the auditor of Palo Alto county, giving a description of the land in question. It is quite possible that the plaintiffs might have used greater effort than that shown to find the land, but it is clear that they have never abandoned it, and that they were continually making some effort to obtain a description of it. In view of their habits and condition of life, and the circumstances with which they were surrounded, we are of the opinion that the efforts they made were reasonable, and that nothing in the course they have pursued is sufficient to defeat their right to recover. The controlling facts involved in this branch of the case are wholly unlike those which were held in *Bacon v. Chase,* 83 Iowa, 521 (50 N. W. Rep. 23); *Mathews v. Culbertson,* Id. 435 (50 N. W. Rep. 201); and *Withrow v. Walker,* 81 Iowa, 655 (47 N. W. Rep. 893), to bar a recovery.

III. We are next required to determine whether the defendants have acquired title by adverse possession, and that is the question of greatest difficulty in this case. This action was commenced on the first day of November, 1893. It is claimed by the defendants, that they have held adverse possession of the land of such a character, and for such a length of time, that this action is barred by the statute of limitations. The defendant J. K. Steenson, claims to be the owner of the north half of the southwest quarter of section 2, the defendant Joseph Kibbie, claims to be the owner of the south half of that quarter, and the defendant M. L. Brown, claims to own the southeast quarter of section 3. In July, 1881,

John Meads held whatever interest in the southwest quarter of section 2, was conveyed by the Hawley deed. In December of that year he executed a warranty deed therefor to Althea, Josephine and Alice Miller. In January, 1891, they executed a warranty deed therefor to L. J. Omera. In May, 1891, he gave to Kibbie a warranty deed for the south half of the quarter; and in April, 1892, he gave to Steenson a warranty deed for the other half, pursuant to a contract made with him the previous year. In September, 1879, M. L. Brown received a conveyance from the grantee in the Hawley chain of title, to the southeast quarter of section 3. At that time both quarters were uninclosed and unimproved prairie land. The firm of Brown & Robbins, of which M. L. Brown was a member, was the agent for the Millers, and authorized to rent the land for them while they claimed to own it. Brown & Robbins also had charge of the quarter in section 3. In the year 1881, the quarter in section 3, was leased to Steenson, and he has held it as a tenant of Brown continuously since. He also held the quarter in section 2, as a tenant of the Millers, from 1881, until they conveyed their interest in it, excepting for one year, when a man named Fagan leased it of McCarty & Linderman, who were also authorized to rent the land for the Millers. In the year 1891 breaking was done on each of the eighties in section 2, and there can be no question that the occupation of those tracts since that time has been sufficient to support the running of the statute. The controversy is chiefly in regard to the nature, extent, and effect of the possession of both quarters held prior to 1891, and of that in section 3, since that time. The two quarters were rented by Steenson for the purpose of pasturing them, and mowing grass and making hay upon them. He had a herd of from three to four hundred cattle, which were kept

on these tracts of land, and others near by, in charge of a herder, during the grazing season. Other herds were kept in the vicinity, and there is testimony to the effect that cattle were pastured wherever the persons in charge thought proper to drive them, that unbroken prairie land was treated as common pasturage for cattle which might be driven upon it, and that other cattle than those in the care of Steenson, were pastured on the land in controversy, during a part of the time in question. But the preponderance of the evidence shows that, although some land in that vicinity was treated by the herders as common property, yet when a herder had a lease for a tract, his right to it was recognized as exclusive. This was true of the land in question. It has been occupied and used by its owners and their tenants continuously and exclusively since the year 1881. They have pastured it during the grazing season of each year, and have cut grass and made hay upon it. They have kept other persons and their stock away from the land, and have used it for all the purposes for which it was adapted in the condition in which it existed. It is not necessary, to constitute adverse possession of land, that it be plowed or fenced, nor that the claimant actually reside upon it. It is sufficient if it be use for the purposes for which it is at the time adapted, during the season when such use is practicable. It would not be necessary to actually occupy unbroken prairie land during the winter season, but it would be sufficient to occupy it during the proper season for grazing and making hay. The defendants, Brown, Kibbie, Steenson, and the Millers, entered into possession of the land under color of title and claim of right, and they and their grantors have paid all taxes which have accrued upon it commencing with the year 1858. There can be no question in regard to their actual good faith,

even though they may have had constructive notice that their title was defective. We conclude that the occupation and use of the land in question have been sufficient to give the defendants title by adverse possession. Our conclusion has support in the following authorities: *Booth v. Small*, 25 Iowa, 178; *Clement v. Perry*, 34 Iowa, 564; *Spitler v. Scofield*, 43 Iowa, 571; *Nolan v. Grant*, 51 Iowa, 519 (1 N. W. Rep. 709); *Forey v. Bigelow*, 56 Iowa, 381 (9 N. W. Rep. 313); *Dorweiler v. Callanan*, 91 Iowa, 299 (59 N. W. Rep. 74); *Ewing v. Burnet*, 11 Pet. 41; *Draper v. Shoot*, 25 Mo. 197; *Lantry v. Parker* (Neb.) (55 N. W. Rep. 962); *Whitaker v. Shooting Club* (Mich.) (60 N. W. Rep. 983); *Sauers v. Giddings* (Mich.) (51 N. W. Rep. 265); Wood, Lim. Act. sections 259-267. The decree of the district court appears to be right, and it is AFFIRMED.