Argued August 6, decided August 13, 1912.

## QUINN v. WILLAMETTE PULP & PAPER CO.*

[126 Pac. 1.]

ADVERSE POSSESSION—POSSESSION BY TENANT.

1.  Possession of land by a lessee inures to the benefit of the lessor, for the purpose of perfecting title by adverse possession.

ADVERSE POSSESSION—SUFFICIENCY.

2.  Use of riparian land as a boat yard and wood yard, as a means of ingress and egress to and from the river, and assertion of right to receive pay for mooring logs in the river adjoining the land, and long use of the land by claimant's tenant, shows adverse possession.

LIMITATION OF ACTIONS—PLEADING.

3.  Limitations must be specially pleaded to be a bar to a suit to quiet title.

ADVERSE POSSESSION—ACQUISITION OF TITLE.

4.  Absolute title to land can be conferred by adverse possession for the statutory period of limitations.

ADVERSE POSSESSION—ADVERSE AND EXCLUSIVE POSSESSION.

5.  What constitutes "adverse and exclusive possession" depends very much on the character of the land and the purposes for which it is adapted, intended, and used.

ADVERSE POSSESSION—NATURE OF QUESTIONS.

6.  Whether limitations have run against a claim to land is a mixed question of law and fact.

From Clackamas:  JAMES A. EAKIN, Judge.

Statement by MR. JUSTICE BEAN.

This is a suit by W. W. Quinn against the Willamette Pulp & Paper Company to quiet title.

Plaintiff alleges that he is the owner and in the possession of the tract, and submits evidence tending to support his title by adverse possession.

Defendant denies the allegations of the complaint, asserts title to the land by mesne conveyances from Absalom F. Hedges and wife, and also avers that plaintiff's claim is a cloud upon defendant's title and against its rights.

*As to adverse possession by tenant, see note in 53 L. R. A. 941.

REPORTER.

Plaintiff, by a reply, puts in issue the new matter of the answer.

The premises in controversy are a part of the donation land claim of Absalom F. Hedges and Elizabeth J. Hedges, his wife, granted to them by the United States under a patent issued April 19, 1867. This disputed tract consists of a strip of land 29 feet in width at the northerly end and 75 feet in width at the southerly end, situated about two miles south of Oregon City, abutting on the Willamette River and lying between that and the county road on the southeast. Plaintiff is the owner of a piece of land adjoining the strip in dispute on the southeast, and claims that his land extends to the river bank. Formerly three small tracts, part of the donation land claim, now known as the Weston tract, of one and one-half acres, the Smith tract, of one-half acre, and the J. Hedges tract, of one acre, were conveyed, and the northwesterly line next to the river, as demonstrated by the surveys made in recent years, extended along the county road, which was formerly located between the railroad and the river. On June 11, 1864, A. F. Hedges and wife, by a warranty deed, conveyed to Ezra Weston a tract of land described as situated in Clackamas County, State of Oregon, to wit:

"Beginning at a post N. 57 degrees 15′ E. 28.53 chains from the upper corner (on the right bank of the Willamette River) of A. F. Hedges land claim No. 40, in township No. 3 south of range No. 1 east of the Willamette meridian, Oregon, from which a yew tree 12 in. bears S. 37 degrees E. 90 links distant, a dogwood 8 in. bears N. 29½ W. 83 links distant; thence S. 56 degrees 15′ W. 5.00 chains to a post; thence S. 33 degrees 45′ E. 3.00 chains to a post; thence N. 56 degrees 15′ E. 5.00 chains to a post; thence N. 33 degrees 45′ W. 3.00 chains to the place of beginning, containing 1.50 acres (one 50-100)."

In 1864 Hedges and wife conveyed a portion of the
D. L. C. to Joseph Hedges. July 1, 1865, they conveyed
about three and one-half acres to Francis S. Pacquet.
The Weston tract, above described, is referred to in each
of the other two conveyances.

Plaintiff and his predecessors in title have been in
the undisputed possession of these tracts since 1864.
They have claimed ownership to the river, and have paid
the taxes assessed thereon during that time. A right of
way, 60 feet wide, was obtained by the Oregon & Cali-
fornia Railroad Company in 1870, and A. F. Hedges
assisted in obtaining the deed therefor from Pacquet.
Some time after the railroad was constructed, its loca-
tion was changed, so that it ran nearer to the river,
and the county road was located on the southeast side
of the railroad. A portion of the strip in dispute is
covered by the railroad, and the remainder lies between
that and the Willamette River. The land is chiefly valu-
able for its water front, where the water is very deep.
It is sandy land and slopes towards the river, with wil-
low trees scattered along the bank. A small portion,
where a fill has been made by the railroad company, is
suitable for tilling. The Government survey of the nor-
therly line of the Absalom F. Hedges D. L. C. meanders
the Willamette River. This strip of land in controversy
was not fenced until two years ago; but the land on the
southeast of the railroad, which is not in dispute, has
been inhabited, fenced, and cultivated since some time in
the '60's. During the latter part of that time, the land
in question was used as a boat yard. One steamer, a
scow, and a few skiffs were built there by the Pacquets.
The tract was also used as a wood yard in preparing
wood, which had been taken from the river, for fuel.
About the 1st of September, 1893, the defendant com-
menced using the river opposite the disputed land for the

purpose of holding rafts of logs, which were tied to trees. November 23, 1894, Peter Pacquet, then owner of the land, made objections and demanded payment for the use of the water front. An arrangement was made for such rental to begin September 1, 1893, and Pacquet leased the defendant the right to so boom his logs opposite the land at $24 per annum. The lease was continued from year to year, and the right was exercised continuously until 1906. The lessor reserved certain rights to land boats, and pass stone in a chute, from a quarry on land adjoining the Weston tract, to the boat. No question was ever raised in regard to the right of plaintiff and his predecessors in interest to the use of the land, and no other claim thereto was made by any one until about 1906. At that time a survey of the adjoining land was made and an abstract of title obtained. The disputed territory appearing not to be included in the Quinn tract, the defendant obtained a quitclaim deed from the grantee of the heirs of A. F. Hedges, by virtue of which defendant now claims title.

AFFIRMED.

For appellant there was a brief over the names of *Messrs. Griffith & Leiter,* with an oral argument by *Mr. Rufus A. Leiter.*

For respondent there was a brief and oral arguments by *Messrs. C. D.* and *D. C. Latourette.*

MR. JUSTICE BEAN delivered the opinion of the court.

It is shown by the evidence that Peter Pacquet, former owner of the land, claimed the land to the edge of the water; claimed that the corner of the Weston tract was right at the river. Each of the different owners of the adjacent land claimed and believed that they owned to the water's edge. In 1906 defendant refused to pay rent for the use of the river front. Pacquet then rented the

same to the Crown Paper Company.   It would take an expert civil engineer to determine whether or not the limits of the land, as conveyed to plaintiff by the description in the various conveyances, extend to the river. It is unnecessary to speculate as to the real reason for making the description or survey of the land as made in the early '60's.

1.   The defendant is shown to have obtained its quit-claim deed after having been a tenant of the plaintiff and his predecessors in interest for more than 10 years prior to the commencement of this suit.   The possession of the company during all that time was the possession of the lessors, under whom the company held, and inured to the lessors' benefit for the purpose of perfecting title. 1 Cyc. 1004; *Anderson* v. *McCormick,* 18 Or. 301, 303 (22 Pac. 1062) ; *Rowland* v. *Williams,* 23 Or. 515, 523 (32 Pac. 402) ; *Stephenson* v. *Van Blokland,* 60 Or. 247 (118 Pac. 1026).

At the time of the company's taking the deed from the Hedges' heirs, it had full knowledge of plaintiff's claim that the tract constituted a part of what was known as the "Pacquet Place."   The defendant should not now be permitted to contradict such possession and claim of ownership on the part of the plaintiff.   Pacquet lived in a house across the railroad from the river bank for a long time.   Henry Hedges, son of A. F. Hedges, deceased, testified that his father, after selling the tract to Pacquet, never claimed any right to the portion next to the river.

2.   It is fairly deducible from the evidence in the case that plaintiff and his predecessors in interest have been in the actual, visible, notorious, hostile, exclusive, and adverse possession of the land in question continuously since 1864.   Counsel for defendant claims that the use of the land was not sufficient to amount to an adverse

possession. Such use was possibly not so notorious as it would have been, had the tract been more extensive or susceptible of more important uses. The use thereof as a boat yard and wood yard, as a means of ingress and egress to and from the river for the purposes of landing and loading boats, in connection with the adjacent tract, the plain assertion of the right of Pacquet to receive pay for mooring logs in the river adjacent thereto, and the long use made by defendant, as tenant of Pacquet and plaintiff, Quinn, for such purpose, and the payment of taxes thereon, we think amounts to an adverse possession, within the meaning of the law. Fencing, building, and cultivation upon the land did not appear to come within the natural uses made thereof. The river served as a line of demarcation upon one side of the strip, and the railroad on the other.

3, 4. When the statute is relied on as a bar to the remedy merely, it must be specially pleaded. But, where the title to real estate is in question, the operation of the statute is found to have a higher range. It is capable of conferring an absolute title. *Hill* v. *Bailey*, 8 Mo. App. 85, 87; 1 Cyc. 1140.

It was said by Mr. Chief Justice BEAN, in *McNear* v. *Guistin*, 50 Or. 377, 380 (92 Pac. 1075, 1076), that: "There is no particular manner by which such possession may be indicated or made manifest; and no particular act or series of acts are required to be done on the land. There must, however, be actual use and occupancy, continuous for the necessary length of time, of such an unequivocal character as will indicate to the owner an assertion of an exclusive appropriation and ownership."

5. What is an adverse and exclusive possession depends very much upon the character of the land and the purposes to which it is adapted and for which it

is intended and for which it is used. *Bowen* v. *Guild,* 130 Mass. 123. See *Dorr* v. *School Dist. No. 26,* 40 Ark. 237, 243.

We also quote from the case of *Ewing* v. *Burnet,* 11 Pet. 41, at page 52 (9 L. Ed. 624), as follows: "So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule, adapted to all cases." See, also, *Bell* v. *Denson,* 56 Ala. 444, 449.

6. There had been time for the statute of limitation to have run three times before the defendant ever had anything to do with the land in dispute; and the title of Pacquet, plaintiff's grantor, was perfected before that time. Since then there has been nothing to divest him or his grantee of such title. On the other hand, the occupancy of defendant, under his lease, inured to the benefit of plaintiff and his grantor. Again, the statute of limitations has had time to run, and, we think, did run, as against Absalom F. Hedges or any one claiming under him. In such a case the possession must be suitable to the character of the land. It is a mixed question of law and fact. Every case in which it is involved should be determined by the circumstances of that particular case. What is adverse possession is one thing in a densely settled country, another thing in a sparsely settled region, and still a different thing in or near a town or village, especially where property is involved, of which peculiar use is made. *Leeper* v. *Baker,* 68 Mo. 400, 407; *Brumagim* v. *Bradshaw,* 39 Cal. 24.

The plaintiff and his predecessors in interest exercised acts of ownership over this strip of land by using it for the purposes for which it was peculiarly adapted. Their possession of the tract was as visible and notorious as it could well have been, considering the condition and the use made of the land.

It is a satisfactory presumption, unless overcome by evidence, that an uninterrupted adverse possession of real property for 20 years or more has been held pursuant to a written conveyance. Section 799, subd. 38, L. O. L.

The use of the water front by defendant, for more than 10 years, for the purpose of booming its rafts of logs, by means of a cable extending to a tree on the land, and from that to a "dead man" near the land, was as plain an assertion of dominion over the tract itself as if a wharf with warehouses had been constructed at this place.

Defendant did not experience any difficulty in finding out who claimed the land when it first tethered its rafts along the shore. Pacquet, the owner of adjacent land, soon hove in sight and demanded compensation therefor. We think the evidence clearly supports the findings of the trial court. With marked ability it is contended by counsel for defendant that the use of the land and adjacent river during the time, as shown by the evidence, did not rise to the dignity of adverse possession, so as to ripen into a title. With this conclusion we are unable to agree.

The decree of the lower court will be affirmed.

AFFIRMED.

MR. JUSTICE McBRIDE took no part in the consideration of this case.

---

On Motion to Dismiss, decided August 13, 1912.