Argued January 7, affirmed February 17, 1960

NORGARD ET AL *v.* BUSHER ET UX

349 P. 2d 490

*Orval N. Thompson,* Albany, argued the cause for appellants. On the brief were Weatherford & Thompson, Albany, and Morley, Thomas & Orona, Lebanon.

*Harry G. Hoy,* Oceanlake, argued the cause and filed a brief for respondents.

Before McALLISTER, Chief Justice, and ROSSMAN, O'CONNELL and HARRIS, Justices.

O'CONNELL, J.

This is a suit to quiet title to a strip of land the record title to which is in the defendants. Plaintiffs claim title by adverse possession. The strip constitutes the southerly portion of land deeded to the defendants; it will form the northerly portion of plaintiffs' land if they are successful in this suit. The lower court entered a decree for the plaintiffs, quieting title in them to the disputed strip as described in the complaint. Defendants appeal.

In 1931 Robert and Ellen Larson conveyed to plaintiff, Edward Norgard and Cary Norgard, his wife, the south half of the south half of the northwest quarter of Section 31, Township 11 South, Range 10 West, excepting a strip of land three rods in width immediately south of the north line of the described property, and extending the entire width of the quarter section. The Larsons then conveyed the land adjoining plaintiffs' land on the north to E. C. and Anna Montgomery. This conveyance included the three-rod strip excepted from the conveyance to plaintiffs. Plaintiff Anders Norgard acquired an interest in the land by deed from his parents, Edward and Cary Norgard. In 1946 the Montgomerys conveyed the three-rod strip to plaintiffs. In 1950 the Montgomerys conveyed the rest of the tract north of plaintiffs to the defendants. Both plaintiffs' and defendants' land is bounded on the west by the Yaquina river, and the westerly portion of both parcels consists of tidelands over which the waters of the river ebb and flow.

From the tidelands running easterly through the southerly part of the land described in defendants' deed, a woven wire fence runs for a distance of 1,134 feet. The fence was in existence in 1931 when plain-

tiffs purchased their land from the Larsons. Apparently it was the intention to erect this fence along the true line dividing the north and south half of the south half of the quarter section; however, the fence was located approximately 410 feet north of this true line. Since, at the time of the original purchase, the plaintiffs did not acquire the three-rod strip immediately south of the true line, it was understood that the use of the strip by plaintiffs was permissive only. When the three-rod strip was conveyed to plaintiffs in 1946 it was assumed then that the fence marked the north boundary of plaintiffs' land and the south boundary of the grantors' land.

As we have already indicated, the woven wire fence extended only 1,134 feet from the tideland to the east. In 1934 or 1935 plaintiffs decided to extend the fence further to the east. At that time they had not yet acquired the three-rod strip and since they assumed that the fence was along the true line dividing the south and north halves of the south half of the quarter section, they measured three rods south from the woven fence and constructed a barbed wire fence which ran to the east approximately 400 feet. To tie in the two fences it was necessary to run the barbed wire fence to the north, which was done at an angle and is referred to in the testimony as a "jog." The barbed wire fence ran from the jog to an alder tree which was west of the easterly line of plaintiffs' land. The testimony is not clear as to the course of the fence east of the alder tree. It appears that the fence was not run directly east from the tree but angled off to the southeast until it reached the fence running north and south marking the easterly boundary of plaintiffs' land.

The disputed strip can, therefore, be divided roughly

into the portion west of the jog, measuring approximately 1,134 feet long and 410 feet wide (plus the tideland area if this strip is extended westerly) and the portion east of the jog to the alder tree, this strip being 408 feet long and 360½ feet wide (410 feet less three rods) and finally an angular strip running from the tree to plaintiffs' east line.

It is contended by defendants that possession under mistake or ignorance as to the true line and with no intent to claim beyond the true line is not adverse because the possession lacks the requisite element of hostility.

Where an occupant of land is in doubt as to the location of the true line it is reasonable to inquire as to his state of mind in occupying the land in dispute. If, having such doubt, it was his purpose to hold the disputed area only if that area was included in the land described in his deed, then it is reasonable to say that the requisite hostility is lacking. But, if the occupation of the strip is under a mistaken belief that it is included in the description in his deed (a state of mind sometimes described as "pure mistake" to distinguish it from the cases of "conscious doubt"), then his possession is adverse. The leading case adopting this latter view is *French v. Pearce,* 8 Conn 439, 21 Am Dec 680 (1831).

In *Bond v. O'Gara,* 177 Mass 139, 58 NE 275 (1900) the rule is explained by Holmes, C. J., as follows:

> "It is true, of course, that a man's belief may be immaterial as such. Probably, although the courts have not been unanimous upon the point, he will not be the less a disseisor or be prevented from acquiring a title by lapse of time because his occupation of a strip of land is under the belief that it is embraced in his deed. His claim is not

limited by his belief. Or, to put it another way, the direction of the claim to an object identified by the senses as a thing claimed overrides the inconsistent attempt to direct it in conformity with the deed, just as a similar identification, when a pistol shot is fired or a conveyance is made, overrides the inconsistent belief that the person aimed at or the grantee is some one else." 58 NE at page 276.

The same idea is expressed more succinctly in Fuller, Adverse Possession—Occupancy of Another's Land Under Mistake as to Location of a Boundary, 7 Ore L Rev 329, 336 (1928), as follows:

"* * * The intent derived directly from the physical senses, i.e., the intent to claim the land actually occupied, should be regarded as overriding the less immediately effective intent to hold in conformity with the deed."

The fact that the possessor would not have claimed the land as his own had he known that the land was not included in his deed is immaterial. "An inquiry into the actual intent of the possessor is appropriate only in those cases where it appears that the possessor was aware of the possibility that he might be intruding upon his neighbor's land." Fuller, op cit supra at page 338.

A contrary view is found in a substantial number of cases. These cases purport to find the intent of the possessor who occupies another's land under the mistaken belief that it is his, i.e., the possessor's, and hold that if one occupies up to a line and can show no more than a mistaken belief in his ownership of his neighbor's land, his possession is not adverse. The leading case is *Preble v. Maine Central R. Co.*, 85 Me 260, 27 A 149, 21 LRA 829 (1893).

Other cases may be found in Annotation, Adverse
Possession Due to Ignorance or Mistake as to Bound-
aries, 97 ALR 14 at 21.

This latter position finds little or no support in
the texts and periodicals. 3 American Law of Prop-
erty, § 15.3, p 765; § 15.4, p 774; § 15.5, p. 786; 4
Tiffany on Real Property (3d ed) § 1159; Day, The
Validation of Erroneously Located Boundaries by
Adverse Possession and Related Doctrines, 10 U Fla
L Rev 245 (1957); Hackett, Judicial Conflict—Mistake
in Boundary Lines, 9 Harv L Rev 464 (1896); Bord-
well, Mistake and Adverse Possession, 7 Iowa L Bull
129 (1922); Comment, 21 Mo L Rev 296 (1956); Walsh,
Title by Adverse Possession, 17 N Y U L Q Rev 44
(1939); Sternberg, The Element of Hostility in Ad-
verse Possession, 6 Temp L Q 207 (1932); Comment,
3 Vand L Rev 337 (1950); Note, 12 Wash & Lee L
Rev 281 (1955); Bordwell, Disseisin and Adverse
Possession, 33 Yale L J 141 (1923); Ballantine, Claim
of Title in Adverse Possession, 28 Yale L J 219 (1919).
For an excellent analysis of the problem, including
an appraisal of Oregon cases see Darling, Adverse
Possession in Boundary Cases, 19 Ore L Rev 117 (1939).
See also, Fuller, op cit supra.

■ Our own cases are not entirely harmonious, and
some of them quite clearly adopt the view last men-
tioned. *Caufield v. Clark,* 17 Or 473, 21 P 443 (1889);
*King v. Brigham,* 23 Or 262, 31 P 601, 18 LRA 361
(1892); Darling, op cit supra; Fuller, op cit supra.
We think that our law should now be clarified and
we hold that possession under a mistaken belief of
ownership satisfies the element of hostility or adverse-
ness in the application of the doctrine of adverse
possession. To the extent that our previous cases,
including *Caufield v. Clark,* supra and *King v. Brig-*

*ham,* supra, are inconsistent with the view we now adopt, they are overruled.

■ It is clear from the evidence in this case that the plaintiffs occupied the land up to the woven wire fence after the conveyance of the three-rod strip in 1946 under the mistaken belief that they owned it. The land south of the barbed wire fence has been occupied since 1934 or 1935 under a mistaken belief in ownership. This then is a case of "pure mistake" and not one of "conscious doubt," and the element of adverseness or hostility of possession is established.

■ Plaintiffs must also establish that they were in possession of the disputed strip continuously and openly during the ten-year statutory period. ORS 12.050. The testimony is in sharp conflict with respect to this aspect of the case. The record is extremely difficult to read because most of the witnesses in describing the topography and important points of reference failed to identify these matters on any of the exhibits.

Plaintiffs must show that they occupied or used the land as would the ordinary owner of the same type of land, taking into account the uses for which the land was suitable. *Knecht v. Spake,* 218 Or 601, 346 P2d 98 (1959); *Springer v. Durette,* 217 Or 196, 342 P2d 132 (1959); 6 Powell, Real Property, § 1018, p 731.

The evidence clearly establishes that plaintiffs used the land south of and up to the woven wire fence for ordinary farming purposes including the cultivation of crops continuously during the statutory period.

■ The use of the land east of the "jog" in the fence was not as clearly established. The easterly part of the strip was timber land used by plaintiffs for the

pasturing of their cattle. The evidence is sufficient to show that cattle were pastured in this area during the requisite statutory period. The only question presented is whether the plaintiffs' use for this purpose was of such a character as to satisfy the requirements that there be actual possession and that it be "open, notorious and visible." The pasturing of cattle on land of the type in question may, under proper circumstances, satisfy the requisite element of actual possession. *Springer v. Durette,* supra; Annotation: Adverse possession predicated upon grazing of livestock or gathering of natural crop, 170 ALR 838 (1947).

It is contended by the defendants that the evidence in the present case does not establish that plaintiffs' use of the pasturage area in dispute was exclusive or that it was "open, notorious and visible." The foundation for defendants' position in this regard is that the fence running easterly from the jog through the timberland did not constitute a substantial enclosure. It is contended by defendants that the fence was permitted to fall into disrepair and that during most of the statutory period necessary to acquire title by adverse possession there was no barrier to prevent cattle, including plaintiffs' and defendants' as well as range cattle belonging to various neighbors, from moving back and forth across the line now claimed by plaintiffs. It is also contended that the fence through this wild area ends at a point a considerable distance from the eastern boundary of plaintiffs' land and, therefore, does not completely enclose their land.

Much of the testimony related to the condition of the fence; defendants' witnesses testifying that it had long been in a state of dilapidation; plaintiffs' witnesses testifying that it stood as an effective barrier

until it was damaged in 1954 as a result of logging operations on the easterly part of both plaintiffs' and defendants' lands.

■ Before examining this evidence we wish to clarify the principles to which this proof would be relevant. The construction and maintenance of a fence on the land of an adjoining owner may be significant (1) as evidence that the claimant is asserting a claim to another person's land, *Johnson v. Thomas,* 23 App Cases 141, 151 (D.C. Cir 1904); *Zeilin v. Rogers,* 21 F 103, 108 (9th Cir 1884); Taylor, Actual Possession in Adverse Possession of Land, 25 Iowa L Rev 78, 88 (1939); (2) to establish that claimant's adverse claim is open and visible to the owner, warning him of an assertion which might affect his title, *Baugher v. Boley,* 63 Fla 75, 87, 58 S 980 (1912); *Chicago Title & Trust Co. v. Darley,* 363 Ill 197, 1 NE2d 846 (1936); *Smith v. Badura,* 70 Or 58, 139 P 107 (1914); Harley, Possessory Title to Wilderness Land, 11 U New Brunswick L J 7, 13 (1958); (3) to describe the area, i.e., the extent of the owner's land claimed by the adverse possessor, *Zirngibl v. Calumet & C Canal & Dock Co.,* 157 Ill 430, 42 NE 431, 438 (1895); *Thompson's Succession v. Cyprian,* 34 S2d 285 (La App 1948); 25 Iowa L Rev, op cit supra at 88; 11 U New Brunswick L J, op cit supra at 13; and (4) to aid in the proof that the claimant satisfied the requirement of actual possession of the area in dispute, *Booth & Graham v. Small and Small,* 25 Iowa 177, 181 (1868); *Krueger v. Brooks,* 94 Or 119, 184 P 285 (1919); 25 Iowa L Rev. Op cit supra at 88.

In the instant case, even accepting the defendants' evidence as to the condition of the fence, it is clear that at one time at least it was in good condition and that it was constructed to set off plaintiffs' land from

that which abutted it on the north. The circumstances under which the fence was constructed by plaintiffs in 1934 or 1935 leaves no doubt that plaintiffs intended the fence to mark their northern boundary. At that time they had not yet purchased the three-rod strip excepted in the original conveyance to them. It was understood at that time that the existing woven wire fence was supposed to have marked the line between the north and south halves of the south half of the quarter section. Therefore, when plaintiffs constructed the barbed wire fence extending from the eastern end of the woven wire fence they measured three rods south of the existing fence and then followed a line easterly along what they regarded as their north boundary. The evidence satisfactorily supports plaintiffs' contention that this conduct evidencing their claim of right to the land south of the fence was known to the Montgomerys, then owners of the land now occupied by defendants. From 1934 or 1935, when the fence was constructed, until 1950 when defendants received a deed from the Montgomerys to the north half of the south half of the quarter section, the Montgomerys were the record owners of that parcel. Assuming that the fence was constructed in 1935 and that it continued to stand until 1945, there would be no doubt that plaintiffs' use up to the fence during that period would have been sufficient to make out a case of adverse possession. Once having acquired title against the Montgomerys by such possession, it would not be necessary for plaintiffs to keep up the fence thereafter, and it would be immaterial whether or not defendants, at the time of purchasing their land or thereafter, saw a fence along the line claimed by plaintiffs.

Much of the testimony adduced by the defendants

to show that the land was not substantially enclosed related to the condition of the fence after 1945. That testimony tended to show that the fence posts were down, that the fence wire was rusted, and that brush had grown over both. Plaintiffs contended that the dilapidated condition of the fence was the result of recent logging activities carried on in the area. Several witnesses testified to this effect. There was testimony from witnesses produced by both sides tending to prove that the type of fence post used by plaintiffs deteriorated rapidly and that such posts must be replaced every few years in order to maintain a firm fence. Except, however, for one witness who stated he saw no fences while hunting in this area in 1940, there is no substantial evidence that plaintiffs did not keep up the fence during the period from 1935 to 1945 and there is no reason for us to assume that they did not.

■ The fact that cattle from neighboring farms occasionally found their way to the area claimed by plaintiffs does not render the possession non-adverse. The claimants' possession need not be absolutely exclusive; it need only be a type of possession which would characterize an owner's use. Facts of some similarity were presented in *Ambrose v. Huntington,* 34 Or 484, 56 P 513 (1899) in which this court stated:

> "* * * The fencing may have been maintained indifferently at periods, but the plaintiff has renewed it from time to time, and practically kept it in such a condition as to form a substantial inclosure, up to the time that defendant asserted title thereto; and during all the while plaintiff claimed the entire ownership and title to the land, and so occupied it, in exclusion of all others." 34 Or at 487.

In *Sharrock v. Ritter,* 45 SW 156, 158 (Tex 1898)

the court held "that an inclosure by a fence would not alone show exclusive and adverse possession, unless such fence was sufficiently substantial to afford reasonable protection against the cattle of the neighborhood, but that an occasional breaking of the fence by cattle, or the cutting of the wires by others, by reason of which the cattle of the neighborhood entered upon the land, would not constitute a break in the possession, unless the fence was left in such condition as that the land was open to the cattle of the public for such a length of time as to justify the belief that the defendant did not intend to continue the exclusive appropriation of the same." *Burrows v. Gallup,* 32 Conn 493, 87 Am Dec 186 (1865); *Webber v. Clarke,* 74 Cal 11, 15 P 431 (1887); *Gauthier v. Lovas,* 35 S2d 874 (La App 1948); *Myers v. Hatler,* 121 Or 332, 254 P 355 (1927); *Ogletree v. Evans,* 248 SW2d 804 (Tex Civ App 1952); *Ross v. Houston Oil Field Ass'n.,* 88 SW2d 586 (Tex Civ App 1935).

Nor is the continuity of the possession broken by the plaintiffs' failure to keep out the other cattle at all times. In *Seavey v. Williams,* 97 Or 310, 191 P 779 (1920) the court held that the occasional presence of stock on pasture land claimed adversely by plaintiff was not sufficient to interrupt the necessary continuity of possession. The land claimed by plaintiff in that case had been completely enclosed until a county road was constructed through it, resulting in two openings in the fence. The testimony showed that the cattle of neighboring owners wandered onto the claimed land from time to time. The court said:

"* * * Assuming all that to be true, the few cattle and horses which ran there were nothing more than roaming stock. Their pasturing on the land and the cutting of the fence form the only

evidence tending to show that the plaintiff did not have continuity of possession for more than ten years, the length of time required to perfect title by adverse possession." 97 Or at page 318.

It was clearly established that plaintiffs built the fence in 1934 or 1935. According to plaintiffs' testimony it was built to keep out range cattle and to turn his own cattle. Plaintiffs continued to pasture their cattle in the area in question and it is not unreasonable to accept the testimony that they kept a fence up during the period from 1935 to 1945 to serve the same purpose for which it was originally constructed.

Even assuming that the fence was permitted to fall into disrepair so that, in effect, the area claimed was unenclosed land during a part of the statutory period, the plaintiffs still would be entitled to prevail. As we have already noted, the plaintiffs' initial use of the land for pasture up to the fence was notorious and visible indicating to the Montgomerys the extent of the land to which plaintiffs were asserting ownership. The line of the fence continued to be evidence even after it fell into disrepair. The testimony quite clearly establishes the fact that the line of the fence could be followed even where it was down. Assuming, then, that the fence was kept up during only a part of the period from 1935 to 1945, plaintiffs' use of the area for pasturage continued to constitute an open assertion of right to the strip up to the line of the fence, even though their cattle might roam past that line. See, *Young v. Newbro,* 32 Wash2d 141, 200 P2d 975 (1948).

■ It is not necessary in this state to enclose land with a fence in order to make out a title by adverse possession. See: *Quinn v. Willamette Pulp & Paper*

*Co.,* 62 Or 549, 126 P 1 (1912); *Knecht v. Spake,* 218 Or 601, 346 P2d 98 (1959). Ordinarily, it is of little value to borrow language from other cases to prove that the possession in the case to be decided satisfies the requirements for the acquisition of title by adverse possession. The following cases lend support to our conclusion that plaintiffs' use of the area in the present case, even assuming that it was unenclosed, was sufficient to make out a title by adverse possession. *Munro v. Eshe,* 113 Colo 19, 156 P2d 700 (1944); *Davis v. Haines,* 349 Ill 622, 182 NE 718 (1932); *Dice v. Brown,* 98 Iowa 297, 67 NW 253 (1896); *Monroe v. Rawlings,* 331 Mich. 49, 49 NW2d 55 (1951); *Murray v. Hudson,* 65 Mich 670, 32 NW 889 (1887); *G O S Cattle Co. v. Bragaw's Heirs,* 38 N Mex 105, 28 P2d 529 (1933); *Fessler v. Thompson,* 191 Okla 450, 130 P2d 513 (1942); *Cooper v. Carter Oil Company,* 7 Utah2d 9, 316 P2d 320 (1957); 170 ALR 838, supra.

■ We hold that the evidence adduced by the plaintiffs in the instant case was sufficient to prove a continuous possession of the disputed strip south of the barbed wire fence from 1935 to 1945 through the pasturing of cattle. Testimony presented by plaintiffs and their witnesses to the effect that the fence continued to stand as a barrier to cattle on either side of it was weakened by defendants mainly through testimony describing the condition of the fence after 1945. Thus we are entitled to assume that the fence erected in 1935 continued to stand during the statutory period.

It should be noted in passing that the possession of the strip south of the woven wire fence was adverse for the first time April 9, 1946 when plaintiffs received the deed to the three-rod strip from the Montgomerys. Prior to that time the plaintiffs' possession of the

strip was by agreement with the Montgomerys. Even though plaintiffs' adverse possession dates from April 9, 1946, the evidence sustains their claim that they used the strip south of the woven wire fence for a continuous period of ten years thereafter.

The plaintiffs did not construct a fence on the tidelands to separate the land claimed by them from that abutting on the north. There was a ramp or walkway extending from the upland to the tideland but this structure did not constitute a barrier between the two parcels of land. It is our understanding from reading the record that the plaintiffs used the tideland up to a line extending westerly from the woven wire fence, and that the ramp or walkway was in such a position as to indicate that the plaintiffs claimed the tideland along with the upland up to the line extending from the fence. It was not necessary for plaintiffs to fence the tideland strip in order to obtain title by adverse possession. We hold that the evidence supports their claim of such possession.

As already indicated above, the fence east of the jog did not extend in a direct easterly direction to the north-south line marking plaintiffs' eastern boundary. The fence was described as "angling off" in a southeasterly direction from an alder tree which stood some distance west of the plaintiffs' eastern boundary line. Since plaintiffs can show possession only within the enclosed area, their title by adverse possession cannot extend past the enclosure.

■ We have made a painstaking examination of the transcript of testimony and we are of the opinion that all of the elements necessary to the acquisition of title by adverse possession were established by plaintiffs.

The decree of the lower court is affirmed.