George E. THREET and Mavis W. Threet, husband and wife, Appellees,

v.

Norman Dale POLK, Appellant.

No. 52059.

Court of Appeals of Oklahoma, Division No. 2.

July 8, 1980.

Released for Publication by Order of Court of Appeals Aug. 7, 1980.

468

T. L. Bob Restor, Sand Springs, for appellees.

James D. Hurley, Tulsa, for appellant.

BRIGHTMIRE, Presiding Judge.

In order to resolve a boundary dispute, Norman Polk tore his neighbor's fence down. The neighbor, George Threet, sought judicial relief and, through a jury verdict, obtained it. Polk, who represented himself in the trial court, hired a lawyer and appealed. The main contention is that the trial judge misapplied the law. We hold he did not and affirm.

## I

Threet acquired what we will call lot 15 in 1952. He gardened the unimproved fenced lot until 1956. Later he built a house on it, a driveway next to the fence, and a well house a few feet from the fence line. A couple of years after that Threet erected a new chain link fence replacing the existing one.

Polk acquired lot 14 adjoining the Threet lot on the west in 1973, after having lived there for several years with his mother. In the late 1960's he built a tall redwood fence a few inches west of the chain link. In 1976 Polk approached Threet and told him the link fence was on Polk's property and he wanted it moved to what he thought was the correct line. "I told him," said Threet, "that the fence was on the line and to leave it alone."

A week later Polk went to Threet's house and demanded a survey of the lot be made or else he would tear the fence down. Threet again told him the fence was in the right place and to leave it alone.

On October 13, 1976, Polk backed up his threat with action, tore Threet's fence down, and replaced it with a temporary one on what he conceived to the the true line.

The next day this lawsuit was filed seeking to enjoin Polk from asserting any interest in the disputed land and to recover the cost of replacing the dismantled fence.

## II

Polk says the trial judge did not require Threet to prove all the essential elements of adverse possession, specifically, that his occupation was "hostile" and under a "claim of right." Since these elements were in fact not proved, Polk says, his demurrer to Threet's evidence should have been sustained. Having failed to do this, concludes Polk, the court should have instructed the jury that Threet was presumed to have possessed the controversial land in subordination to the rights of the true owner and as a result Threet had the burden of proving by clear and convincing evidence that he held the land hostilely and under a claim of right for 15 years or more.

Actually, Polk got more than he was really entitled to–a trial by jury. Had Threet moved for judgment after both parties rested the court would have been obliged to grant it. The gravamen of the action, as we said, was to obtain injunctive

relief—an equitable cause triable by the chancellor.[1] Once the court of equity assumed jurisdiction it had authority to settle all issues including the incidental damage plaintiff sought.

## III

The legal foundation for plaintiff's cause of action is the prescriptive title statute.[2] While the statute seems clear enough, inconsistency has marred its application in several boundary dispute cases through the years.

■ In 1927 the court introduced the "acquiescence" or "practical location" concept that had been the common law elsewhere in the country for nearly a century. *Midland Valley R. R. Co. v. Imler*, 130 Okl. 79, 262 P. 1067, *cert. denied*, 277 U.S. 591, 48 S.Ct. 528, 72 L.Ed. 1003 (1928). The substance of this idea is that recognition of an acquiescence in an erroneous boundary line—called a practical location—by the adjoining property owners for the prescriptive period, "confers a title" on the innocent disseisor. A decade later, however, the *Imler* doctrine was dealt a serious interpretational blow in *Reynolds v. Wall*, 181 Okl. 110, 72 P.2d 505 (1937). It held that long mutual acquiescence by adjoining landowners in a deviant property line creates a presumption of a mutual agreement to accept the errant line as the true one—a presumption defensively rebuttable by evidence that the acquiescence was founded on "mutual mistake."

Then two years after *Wall* the court completed the desecration of *Imler* in the short lived views of *White v. Saling*, 185 Okl. 46, 89 P.2d 754 (1939). The *Saling* court expanded the *Wall* philosophy still more favorably to the disseised owner by adopting as the law of the case some unclear and hard to follow remarks of the trial judge. His idea seems to have been that if an irregular boundary line is mistakenly created the benefited owner can never gain a prescriptive title no matter how long he occupies his neighbor's land.

Whether *Saling* had the effect of amending what is now designated as 60 O.S.1971 § 333 became an academic question in 1940 when the high court expressly overruled it in *Johnson v. Whelan*, 186 Okl. 511, 98 P.2d 1103. Characterizing *Saling* as "confusing and ... contrary to the prevailing modern rule," *Whelan* undertook an extensive review of the subject before arriving at a well reasoned result consistent with *Imler*.

■ The supreme court's temporary deviation from *Imler* in *Saling* arose from its endorsement of the trial court's indefensible preoccupation with the question of whether the benefited party occupied the disputed land through an "honest mistake"—an approach which exalted the encroacher's intent over his statutorily significant act of open occupation. The ultimate effect of such thinking is that only the "bad guy" who knowingly decides to appropriate some of his neighbor's property can benefit from our prescriptive title statute. The "good guy," who occupies his neighbor's land under the innocent belief that it is his, receives no statutory benefits according to *Saling*, while his evil intentioned counterpart does—a result not likely to have been contemplated by the legislature. Thus, the *Whelan* court quite incisively observed that "the search for the so-called intent usually degenerates into a search for motives," one of which is legal but immoral, and the other moral but illegal! Sound public policy requires that both intent and motive be rejected as being at war with the fundamental purpose underlying the enactment of the prescriptive title statute—to prevent the assertion of stale title claims to land against long term exclusive occupiers other than licensees. *Whelan*, which espouses this policy, was followed by the high court in 1951,[3]

---

1. *Comstock v. Little*, Okl., 359 P.2d 704 (1961).

2. 60 O.S.1971 § 333. It reads:
   "Occupancy for the period prescribed by civil procedure, or any law of this State as sufficient to bar an action for the recovery of the property [15 years], confers a title thereto, denominated a title by prescription, which is sufficient against all."

3. *Walthers v. Tanner*, 204 Okl. 598, 233 P.2d 303.

in 1961[4] and in 1964.[5]

It was against this common law background that the 1968 decision of *Sudheimer v. Cheatham*, Okl., 443 P.2d 951, primarily relied on by Polk, was begotten. That "Per Curiam" opinion featured a factually classic case of one party occupying an adjoining neighbor's land lying near misplaced fences that had existed much longer than the prescriptive period. The fences "had always been considered boundary lines of the 40 acres," according to a witness who, beginning in 1927, had occupied the encroached land for many years. However, the *Sudheimer* opinion, written by some attorneys to whom it had been farmed out,[6] pushed toward the conclusion sought—affirmance of a judgment denying the occupier a prescriptive title—without mentioning, much less discussing, any of the material Oklahoma decisions on the subject. In fact, the authors cited but a single case—a repudiated 1921 Oregon decision.[7] This old case, like *Saling*, had injected the occupier's intention into the prescriptive mix as an essential element—an element that not only had been rejected by the Oklahoma Supreme Court four years before *Sudheimer*, but by the Oregon Supreme Court itself eight years earlier. Significantly, *Sudheimer* recites no factual evidence which would even place it within the parameters of the old ill–fated Oregon case.

Aside from these incredible shortcomings of *Sudheimer*, there is still another substantial reason why it offers no precedential value here. It has been carefully ignored by the supreme court since its birth while the *Whelan, Walthers* and *Comstock* decisions have enjoyed later approval.[8]

 Inasmuch as the trial court applied sound law and the weight of the evidence clearly compels a resolution of the issues in favor of Threet, the judgment is affirmed.[9]

BACON and NEPTUNE, JJ., concur.

4. *Comstock v. Little*, Okl., 359 P.2d 704. The court, while it did not actually cite *Whelan*, did revert to *Imler* for perceptive guidance.

5. *Hammer v. Bell*, Okl., 390 P.2d 492. The opinion includes a good discussion of the "intent" problem.

6. During the 1960's the supreme court, in an effort to reduce its five year backlog, assigned cases out for opinions to three lawyer panels consisting, however, only of attorneys recommended by the Oklahoma Bar Association. The result was that the opinions sometimes reflected the desires of the authors rather than the law.

7. *Anderson v. Richards*, 100 Or. 641, 198 P. 570 (1921), overruled in 1960 in *Norgard v. Busher*, 220 Or. 297, 349 P.2d 490, 80 A.L.R.2d 1161.

8. *See e. g., Leach v. West*, Okl., 504 P.2d 1233 (1972).

9. Polk is indeed fortunate that punitive damages were not sought for his willful trespass and destruction of property. The jury just might have imposed a substantial penalty.