Argued and submitted April 15, reversed and remanded July 17, 1985

KITZEROW et ux,
*Appellants,*

*v.*

REINHARDT et ux,
*Respondents.*

(82-2-191; CA A32707)

704 P2d 132

Jossi Davidson, Silverton, argued the cause and filed the briefs for appellants.

Ridgeway K. Foley, Jr., Portland, argued the cause for respondents. On the brief were Mildred J. Carmack, Mark H. Wagner, and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Gillette, Presiding Judge, and Van Hoomissen and Young, Judges.

YOUNG, J.

584

## YOUNG, J.

In this quiet title action plaintiffs seek a determination that they are the true owners of a disputed strip of land between their property and that of defendants Reinhardt. The land is within the description of plaintiffs' deed; defendants claim ownership by adverse possession. The trial court found for defendants and quieted title in them. We hold that defendants' action in planting trees on the strip, together with the minimal additional effort they exerted, is insufficient to meet the requirements of adverse possession. We therefore reverse and remand with instructions to quiet title in plaintiffs and for further proceedings on plaintiffs' claim for damages for trespass.[1]

Plaintiffs own the land to the north of the disputed strip, and defendants own the land to the south. Both parcels were originally in the common ownership of Lael Albright. In June, 1970, Albright sold the southern parcel to defendants. In January, 1971, he sold the northern parcel to plaintiffs' predecessor. Sometime in December, 1970, or January, 1971, defendants had the northern portion of their parcel plowed. In February, 1971, they had the plowed portion planted in Douglas fir seedlings in check rows seven feet apart. Defendants intended to plant only to their property line, but their estimate of the location of the line was incorrect. The planting in fact extended about 180 feet into the land to which plaintiffs now have record title. Defendants had the trees sprayed with herbicides by helicopter in 1971 and again in 1972. After that, defendants did nothing with the trees until 1981; they simply let them grow.

The parcel that plaintiffs now own changed hands several times between the time when defendants planted the

---

[1] Plaintiffs also assign as error the court's failure to award them the cost of proving the location of the deeded property line between plaintiffs' and defendants' parcels. Defendants refused, in response to a request for admissions under ORCP 45, to admit the accuracy of plaintiffs' survey. ORCP 46C provides that the court must award costs in such cases unless, among other things, there was good reason for the failure to admit. This criterion gives the court discretion in awarding costs. *See* 4A Moore's Federal Practice ¶ 37.04 (interpreting FRCP 37(c), which is essentially identical to ORCP 46C). We cannot say that the court acted outside the range of its discretion in this case. The survey was not a simple one, and it showed on its face that several important points were determined approximately. The court could properly decide that defendants had good cause to put plaintiffs to their proof rather than accepting the survey without further investigation.

trees and August, 1980, when plaintiffs purchased it. Schiewe, whose company owned the parcel at the time of the planting, saw the trees, believed that they were on his side of the property line and apparently decided that he had received a windfall which would help the property sell.[2] Later owners assumed that Albright had planted the trees before dividing the property. All of plaintiffs' predecessors walked on the disputed strip on occasion and believed that they owned it, but no one—plaintiffs' predecessors or defendants—made more than a casual use of it.

At one time Sandberg, one of plaintiffs' predecessors, and two of his nephews were on the strip collecting cinnabar moth larvae when defendant Justin Reinhardt came along and told Sandberg that he should not be doing that and that he should leave. Sandberg did not want a fight and thought that defendant might have planted the larvae, so he and his nephews left. Neither party discussed the ownership of the strip at that or at any other time.

When plaintiffs purchased the land, the trees were tall and difficult to penetrate because of dead limbs and thick underbrush. Before the purchase, plaintiffs examined an aerial photograph, taken in 1976, which their real estate agent had acquired from the county assessor's office. The assessor's staff had superimposed tax lot boundaries on the picture. Plaintiffs' deeded boundaries coincided with the tax lot boundaries, and the photograph showed their southern boundary going through the trees. Plaintiffs believed that the land they purchased extended to the location shown in the picture, which is within a few feet of where the later survey determined the deeded boundary to be.

In 1980, defendants made an agreement with Publishers' Paper Company, which included an evaluation of all their timber holdings by a forester employed by Publishers. The forester recommended that defendants thin the trees in

---

[2] Schiewe and his partner had previously measured off the property and believed that they knew where the line was. He testified that there was some physical evidence in the area which led them to their belief. He did not say what the evidence was, but other witnesses testified that in later years there were rags on the east and west fences at the approximate boundary between the parcels and that there were signs of a former fence across the property in the same area.

question.[3] Defendants began thinning in April, 1981, more than 10 years after they had planted the trees. Plaintiffs heard the noise of chainsaws, discovered defendants' crew cutting trees on what plaintiffs believed was their land and ordered the crew to stop. At that point plaintiffs and defendants realized that there was a dispute over the true boundary, and that dispute led to this action.[4]

■■ To establish title by adverse possession, defendants must show "by clear and positive proof" that they had "actual, open, notorious, exclusive, continuous, and hostile possession" of the land for the 10-year statutory period, and that they did so under color of title or claim of right. ORS 12.050; *Scott v. Elliott,* 253 Or 168, 178, 451 P2d 474 (1969). Defendants' activities in 1971 and 1972 in planting and spraying the trees were an adequate assertion of possession of the land on which the trees were planted, and their continuing intent to own to the edge of the trees shows hostility to the claims of the deeded owners.[5] However, their possession in later years was neither notorious nor exclusive.

Although defendants' use of the disputed strip was reasonable under the circumstances, so was that of the record owners. All of the record owners believed that they owned the trees, and they regularly went on the disputed area. Plaintiffs limbed several trees to create easier access within 10 years after the planting. It appears that plaintiffs and their predecessors spent more time on the land than did defendants. If the appropriate action for the owner of the trees was simply to watch them grow, plaintiffs and their predecessors watched at

[3] The forester testified that defendants' use of the land after the trees were planted was appropriate under the circumstances for an owner of forest land. Unless some specific action is indicated, it is normal simply to watch the trees grow until they are ready for harvest.

[4] Plaintiffs' claims against the other defendants, Publishers' Paper and the contract logger hired to do the pre-commercial thinning, were settled before trial. The judgment appealed from dismissed plaintiffs' complaint against those defendants and is a final, appealable judgment. *See Oregonians Against Trapping v. Martin,* 72 Or App 210, 695 P2d 932 (1985).

[5] Defendant Justin Reinhardt testified that he intended to own to where the trees were planted. His testimony also showed that he believed that the tree line was the deeded property line and that he did not intend to claim more than the deeded land. This then is a case of "pure mistake" as to the deed boundary, and defendants' occupation is presumed to be hostile. *See Almond v. Anderegg,* 276 Or 1041, 1045, 557 P2d 220 (1976).

least as actively as did defendants. Defendants did not post any no trespassing signs, build a fence at the boundary of the trees[6] or warn the owners of the northern parcel away from the trees. When defendants and plaintiffs had a dispute over a gate which defendants maintained on their common access road, defendants moved the gate to a point 20 feet south of the actual boundary and 200 feet south of the north line of the trees.

Defendants lived on their land for almost all of the 10-year period in question, while plaintiffs and their predecessors came on their parcel only occasionally until near the end of the period. Defendants had the opportunity to make their possession exclusive and notorious, but they did not do so. Defendants must have seen the owners on the disputed strip, but with one ambiguous exception they never asserted their claim. Their actions with the gate gave plaintiffs no reason to think that defendants were claiming all the trees rather than only those to the deeded line. While defendants may have been mistaken about the true boundary, they did nothing, other than plant the trees, which would apprise the owners of the other parcel of the mistake. An adverse possession claimant must "keep his flag flying, and present a hostile front to all adverse pretensions." *Olewine v. Messmore,* 128 Pa 470, 484, 18 A 495 (1889), *quoted in Reeves et al v. Porta,* 173 Or 147, 153, 144 P2d 493 (1944).

> "Those who seek to deprive others of their property by adverse possession should anticipate that they will be held to strict proof, and that, lacking such, they cannot prevail against rightful owners." *Reeves et al v. Porta, supra,* 173 Or at 156.

Defendants' flag flew too low; they have not provided the "strict proof" necessary to deprive plaintiffs of their land.[7]

Reversed and remanded.

---

[6] Photographs in evidence show a loose one-wire fence running part way between the trees and the pasture to their north, but there is no evidence concerning who established the fence or what its purpose was.

[7] Several of the factual issues about which the parties argue do not point sufficiently in one direction or another to require discussion.