Argued and submitted October 31, 1988, affirmed May 24, 1989

HOPKINS et al,
*Appellants,*

*v.*

STATE OF OREGON et al,
*Respondents.*

(CC-86-2116; CA A46219)

773 P2d 825

Ancer L. Haggerty, Portland, argued the cause for appellants. With him on the briefs was Schwabe, Williamson & Wyatt, Portland.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondent State of Oregon. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

No appearance for respondent Boise Cascade Corporation.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

DEITS, J.

## DEITS, J.

This case involves timber rights on a disputed strip of land. Plaintiffs sought a judgment declaring them the owners of certain timber rights and seeking damages from Boise Cascade Corp. (Boise) for an alleged timber trespass on their property. Defendant state counterclaimed, seeking a declaration that it is the owner of the disputed property and damages for plaintiffs' alleged trespass. The trial court held that plaintiffs' predecessor had acquired title by adverse possession before the state's acquisition of the property, but that since that time the state had acquired title by adverse possession. The trial court declared that the state is the owner of the disputed property and that Boise is not liable for any damages. We affirm.

The disputed timber is located on land that lies on the southern border of property on which plaintiffs own the timber rights and on the northern border of property owned by the state. Plaintiffs acquired record title to their land in 1971 from Tom Hopkins, plaintiff Leo Hopkins' father. In 1976, plaintiffs deeded the underlying fee in the property to Eunice Hopkins, Carol Palmberg and Michael Hopkins, but reserved the timber rights. The state's property was formerly owned by Perry and Bertha Smith. Clatsop County acquired the timber rights in a portion of the property by tax foreclosure in August, 1957, and acquired the timber rights on the remainder of the property in August, 1958. The county transferred those rights to the state in August, 1958. In October, 1958, the Smiths conveyed their remaining rights in the property to the state. The property is approximately 200 feet wide and lies between Squaw Creek on the west and Highway 202 on the east, immediately south of the midsection line that divides the Hopkins-state quarter sections.

Plaintiffs argue that the trial court correctly decided that their predecessors had acquired title by adverse possession but that the trial court erred in holding that the state had later acquired title by adverse possession. We do not need to decide whether the trial court was correct concerning plaintiffs' predecessors' title, because we conclude that, subsequently, the state acquired title by adverse possession.

In order to establish title by adverse possession, a party must show by "clear and positive proof" that it has had

actual, open, notorious, exclusive, continuous and hostile possession of property for the ten-year statutory period. ORS 12.050; *Lee v. Hansen,* 282 Or 371, 578 P2d 784 (1978). This action was commenced in 1986; therefore, it was necessary for the state to prove that it has adversely possessed the property since 1976.

■ The evidence demonstrates that the state met the prerequisites for adverse possession for at least ten years before 1986. It acquired record title in 1958. In 1959, the state and Thomas Hopkins, plaintiffs' predecessor, granted each other mutual easements on their land for access roads. The boundary line between their land that was used in the property descriptions in the easements was the midsection line, which is the boundary that the state asserts is correct. In 1960, the state began a survey of its property in the area. In 1963, Robert Morris, the district engineer in charge of the survey, sent Thomas Hopkins a letter notifying him that the state was surveying its land to establish property corners and state ownership boundary lines on all state forestry property in township 6 and that his property boundaries might be affected by the survey. Morris requested that Hopkins notify the State Forestry Department if he had any knowledge of corners. Hopkins did not respond to the request, nor did he mention in any of his conversations with Morris that he knew of any lines or markers that defined the property lines or section lines. The survey showed the midsection line as the boundary and was recorded as a plat map for the township in 1971.

■ In determining whether a claimant has shown sufficient occupancy and use to establish title by adverse possession, the use for which the land is suitable is to be taken into account. *Lee v. Hansen, supra,* 282 Or at 375; *Kitzerow v. Reinhardt,* 74 Or App 582, 584-87, 704 P2d 132 (1985). Since 1968, the state has actively managed this property as timberlands. In 1968 and 1969, the state entered into thinning contracts that included a part of the disputed property.[1] In

---

[1] There is a conflict in the testimony as to whether those contracts included any of the disputed property. However, stumps dating from this period were located in the disputed strip, indicating that thinning probably was done there.

1973, the state publicly offered a clear-cutting contract.[2] Preparation for the sale began in 1978. Roads were built on the property, and the boundaries were marked by signs in the ground in 1980 and 1981. The boundary used to divide plaintiffs' and the state's property was the midsection line. Boise purchased the timber in 1981. Plaintiffs protested the timber sale, asserting that the state survey was in error, but they did not commence a legal proceeding. The timber was cut in 1983 and 1984, and the property was burned and reforested in 1985. This proceeding was brought in 1986.

The state established by clear and positive proof that it had actual, open, notorious, exclusive, continuous and hostile possession of the property for a period of ten years before the commencement of this action and, therefore, the trial court properly awarded title to the state.

Affirmed.

---

[2] In 1977, plaintiffs let a contract for a clear cut on their property. The property to be cut went to the midsection line, but did not include the disputed property. That, at least implicitly, indicates that plaintiffs recognized the midsection line as the boundary.