Argued and submitted December 16, 1997, affirmed April 1, petition for review denied July 14, 1998 (327 Or 431)

Anne-Sabine NOOTEBOOM,
aka Sabine Anna Nooteboom,
and Petra Klane,
*Appellants,*

*v.*

Eugene BULSON
and Leona Bulson,
*Respondents.*

(96CV0284; CA A96545)

956 P2d 1042

Steven L. Wilgers argued the cause for appellants. With him on the brief was Steve Wilgers, P.C..

Martin E. Stone argued the cause for respondents. With him on the brief was Stone, Trew & Cyphers.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

In this action to quiet title, the parties dispute the ownership of a strip of land between their two adjoining parcels. Plaintiffs sought a judgment declaring their ownership. Defendants counterclaimed, asserting that they had acquired the property by adverse possession. The trial court quieted title in defendants, and plaintiffs appeal. On *de novo* review, ORS 19.415(3), we affirm.

The disputed area consists of 2.92 acres of land in rural Coos County. Plaintiffs' property lies directly north of defendants' property, and the disputed area forms the northern/southern boundary between the parties' land. The parties agree that the area is best suited for growing timber, as it is of moderate grade with varying slopes. Remnants of a fence, including a few standing posts, boards, and nails, are located on the northern edge of the disputed strip.

Plaintiffs obtained their interest from their father, George Sichling, in 1992. Sichling's predecessor in interest, Albie Richie, sold Sichling the property in 1964. Neither plaintiffs nor Sichling ever lived on the property. Defendants and their two children began living on their property in 1946. They obtained their interest in 1947, when defendants' grandfather deeded them the property. They continued to live on their property until 1958, when they moved a short distance to Coquille, Oregon.

The true boundary was not questioned until 1995, when plaintiffs attempted to log trees in the disputed area, and defendants claimed ownership of it. A survey showed that plaintiffs owned record title to the property, which prompted them to initiate this quiet title action. Defendants countered that they had adversely possessed the land to the old fence, determined by the survey to lie within plaintiffs' property. The trial court concluded that defendants had acquired ownership of the property by adverse possession. We agree.

■■    To establish title by adverse possession, the party must show, by clear and positive proof, actual, open, notorious, exclusive, continuous, and hostile possession of the property for a 10-year period. *Davis v. Parke*, 135 Or App 283, 286, 898 P2d 804, *rev den* 321 Or 560 (1995); *Hopkins v. State of Oregon*, 96 Or App 717, 719-20, 773 P2d 825 (1989). It is crucial that the party claiming adverse possession use or occupy the land as an average owner of the same type of land would use it. *Davis*, 135 Or App at 287.

■■    We conclude that defendants established by clear and positive proof that they had adversely possessed the disputed property by 1956.[1] When defendants acquired their interest in the property in 1947, defendant Eugene Bulson walked the fence line with his grandfather and understood from doing so that the fence marked the property's boundary. Accordingly, defendants are entitled to the benefit of their grandfather's possession and use of the property under the tacking doctrine. *Evans v. Hogue*, 296 Or 745, 755, 681 P2d 1133 (1984) (subsequent possessors of property may tack on periods of prior possession by predecessors in interest if they are in privity with each other; privity exists if there is an understanding that the transfer includes particular property). Defendants' grandfather selectively harvested approximately 75 trees in the disputed area in 1946. Around 1950, defendants planted about 100 trees in the disputed area. Several times a year for the next 30 years, defendants pruned and "limbed" the trees and cleared underbrush from them to aid the trees' growth. Defendants' children occasionally rode their horses through the area, up to the fence line, until defendants moved from the property in 1958.

    Given the character of the property as most suitable for growing timber, defendants used the disputed area as an owner would use it. For at least the requisite ten-year period,

[1] The parties produced evidence at trial about the use of and activities on the disputed property from 1946 through 1995. We find it unnecessary to analyze that entire time period, because we find that title vested in defendants through adverse possession by 1956. Thus, we need not consider the nature and frequency of defendants' activities on the property after they moved from it in 1958. For the same reason, we need not determine whether the statutory requirements under ORS 105.620 are satisfied. The statute applies only where the adverse interest, if any, vests after January 1, 1990. *Markovich v. Chambers*, 122 Or App 503, 506, 857 P2d 906 (1993).

between 1946 and 1956, they harvested the timber on the land, planted new trees to harvest in the future, and tended to those trees each year. The family also occasionally used the land recreationally, in ways and to a degree consistent with the land's character. Their possession was exclusive. Plaintiffs argue that defendants' uses and activities were too infrequent to satisfy the requirement that defendants' possession be continuous, open, and notorious. However, as we stated in *Montgomery v. Sellers*, 48 Or App 719, 724, 618 P2d 5, *rev den* 290 Or 211 (1980), a case where rural, undeveloped land was adversely possessed:

> "Although [defendants] did not do much with the disputed strip of property, they used it in the same way they used the rest of their land: they used it for recreation, they did some trimming and clearing and they occasionally repaired the fence. These are the types of uses to which an owner would put such land."

The same conclusion follows from the record in this case: the nature and extent of plaintiffs' possession and use of the property were consistent with the character of the land.

Plaintiffs also argue that the fact that the fence between the properties in this case was not maintained, had been in poor condition for many years and, at the time of trial, was mostly a remnant is fatal to any claim of adverse possession. In plaintiffs' view, case law consistently requires construction or maintenance of a "substantial fence" along an alleged boundary line. To be sure, fences and their condition have often been considerations in adverse possession cases. Most recently, for example, in *Rayburn v. Coffelt*, 153 Or App 76, 957 P2d 580 (1998), we acknowledged that failing to maintain a fence, or to post no-trespassing signs, or to take other affirmative steps to signify a fence as the boundary are factors to consider in assessing a claim for adverse possession. However, the significance of a fence and of its state of repair in any particular case depends on the character of the land and what the fence communicates to others about possession of the disputed property. Each case can be expected to turn on its particular facts.

Here, defendants' failure to maintain the fence does not frustrate their claim of adverse possession. Unlike the

disputed property in *Rayburn*, which included a grassy area suitable for and in fact used for livestock grazing, the property in question here is best suited for timber and has not been used for livestock grazing, thereby decreasing the importance of a substantial fence. Although mere remnants of the fence now lie along the boundary, a recognizable fence still existed when defendants acquired their interest in 1947. The fence was in poor condition at that time, but the record establishes that fences in the area typically were not maintained in the 1940s to 1950s. The significant point is that, notwithstanding its deteriorating condition, the fence was adequate to be regarded and in fact *was* regarded as the boundary between plaintiffs' and defendants' properties. Defendants' grandfather logged up to the fence line and stopped. During the relevant time period, plaintiffs' predecessor in interest selectively logged his property, again going to the fence line and stopping. There is no evidence that, until the present dispute arose in 1995, either plaintiffs or any of plaintiffs' predecessors in interest ever disregarded the fence line and crossed onto or made use of the disputed property. Finally, even neighbors regarded the fence, despite its aging state, as marking the boundary between the two properties. Defendants' failure to maintain the fence line loses significance in light of the evidence that it was not needed to function as a fence (*e.g.*, to contain livestock), and it adequately was serving as a boundary line despite its deteriorated condition. Under the circumstances, their adverse possession claim is not defeated by the fence's state of disrepair.

Affirmed.