Argued and submitted September 5, 2019; general judgment reversed and remanded, supplemental judgment reversed December 2, 2020

Frank H. WOOD
and Peggy J. Wood,
*Plaintiffs-Appellants,*

*v.*

Marc E. TAYLOR
and Cathleen L. Claussenius,
tenants by the entirety,
*Defendants-Respondents,*

*and*

OREGON COMMUNITY CREDIT UNION,
*Defendant.*

Lincoln County Circuit Court
15CV29505; A166593

479 P3d 560

This is a property dispute between neighbors regarding a roughly triangular area of land at the adjoining boundary of their properties. When plaintiffs purchased Lot 802 in 1991, they did not commission a survey of the lot, look at maps, or study the deed description. They assumed that their western boundary was marked by an existing chain link fence, such that their lot was roughly rectangular. The area to the east of the fence was unkempt like Lot 802, while the area to the west of the fence was maintained. Over 20 years later, in 2014, defendants purchased neighboring Lot 800 and had it surveyed. As a result, the parties learned that the deeded property line ran with the fence for a ways, then slightly east of the fence, and finally cut southeast at a 45-degree angle before connecting with a road on the southern border. Defendants removed the existing fence and built a new fence on the deeded property line. Plaintiffs filed this action, asserting claims for adverse possession, ejectment, and damages. After a bench trial, the trial court dismissed plaintiffs' claims on the basis that plaintiffs had failed to prove the "honest belief" requirement for adverse possession, specifically that they had failed to prove that any honest belief of actual ownership was reasonable. Plaintiffs appeal, arguing that the trial court erred in dismissing their claims. *Held*: The trial court erred in its application of the law of adverse possession. On limited *de novo* review, the Court of Appeals concluded that the evidence established the "honest belief" required by ORS 105.620(1)(b) and remanded for the trial court to address the other elements of adverse possession.

General judgment reversed and remanded; supplemental judgment reversed.

David V. Cramer, Judge. (General Judgment)

David B. Connell, Senior Judge. (Supplemental Judgment)

Natalie C. Scott argued the cause for appellants. Also on the briefs was The Scott Law Group.

Thomas M. Christ argued the cause for respondents. Also on the brief was Sussman Shank LLP.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

AOYAGI, J.

General judgment reversed and remanded; supplemental judgment reversed.

**AOYAGI, J.**

This is a property dispute between neighbors regarding a roughly triangular area of land at the adjoining boundary of their properties. The disputed area is included in defendants' deed, but plaintiffs claim to have acquired title to it by adverse possession. After a bench trial, the trial court dismissed plaintiffs' claims on the ground that plaintiffs had failed to prove the requisite "honest belief" for adverse possession. Under ORS 105.620, in addition to the other elements of adverse possession, plaintiffs had to prove that, upon first entering into possession of the disputed area, they had an "honest belief" of actual ownership, which belief continued for 10 years, had an objective basis, and was reasonable under the particular circumstances. Plaintiffs appeal. For the following reasons, we reverse and remand.

## STANDARD OF REVIEW

Plaintiffs request *de novo* review on their adverse possession claim. They ask that we find the facts anew, assess the proof of each element of the claim, and conclude that plaintiffs proved adverse possession of the disputed area.

Exercising our discretion, we decline to provide complete *de novo* review, but we do grant limited *de novo* review. *See* ORS 19.415(3)(b) (granting us "sole discretion" whether to allow *de novo* review in equitable proceedings); ORAP 5.40(8)(c) (describing considerations for when we will provide *de novo* review). Specifically, we grant *de novo* review as to the "honest belief" element of plaintiffs' adverse possession claim, while leaving it for the trial court to decide on remand whether plaintiffs proved the other elements of adverse possession—that is, actual, open, notorious, exclusive, hostile, and continuous possession for 10 years. In deciding whether plaintiffs proved the requisite "honest belief," we make supplemental findings as necessary, based largely on uncontested evidence, but otherwise rely on the findings made by the trial court.

In the context of the considerations described in ORAP 5.40(8), we grant limited *de novo* review for two

related reasons. First, although the trial court dismissed plaintiffs' adverse possession claim on the specific basis that any honest belief that they had in 1991 was unreasonable, "honest belief" is one element with several components that must be considered together for proper interpretation. Second, given our disposition, it would make little sense to issue a decision on whether a *hypothetical* honest belief was reasonable. We therefore grant limited *de novo* review to address the "honest belief" element in its entirety, including aspects of that element that the trial court either assumed without deciding or did not address. But, as to any findings that the trial court actually made, which are supported by evidence, we adopt those findings and do not find those facts anew.

We state the facts accordingly, limiting our discussion to the facts relevant to the "honest belief" element.

## FACTS

In 1991, plaintiffs bought Lot 802 in a rural residential area outside Newport. The property faces Yaquina Heights Drive, as does the neighboring lot to the west, Lot 800. It is undisputed that plaintiffs' 1991 deed accurately described the legal boundaries of their property, with the italicized portion describing the western boundary:

> "Beginning at a point on the Northerly line of the old U.S. Highway 20 location, said point being 3.50 feet North of the South quarter section corner of Section 4, Township 11 South, Range 11 West, Willamette Meridian, in Lincoln County, Oregon; thence North 217.90 feet; thence West 75 feet; *then South 167.42 feet; thence South 45 deg. East 67.02 feet to said Northerly line*; thence Easterly along said Northerly line 27.78 feet to the point of beginning."

(Emphasis added.)

When plaintiffs bought Lot 802, there was a chain-link fence on the western side of the lot. The grass to the west of the fence (on the neighbor's property) was maintained, while the grass to the east of the fence was overgrown like all of the grass on Lot 802. There were also two burn barrels on the east side of the fence. Standing on the

house's porch, Lot 802 looked to plaintiffs like a roughly rectangular parcel, bounded by Yaquina Heights Drive on the south, another road on the east, a fence on the north, and the chain-link fence on the west. Plaintiff Frank Wood testified at trial that it was "just a no-brainer [that] there's your property line, there's the fence." Plaintiff Peggy Wood gave similar testimony.

Plaintiffs did not have Lot 802 surveyed before they bought it, nor did they or their mortgage lender have the property appraised. The home-buying process was relatively informal in 1991. Plaintiffs never talked to their realtor or anyone else about the property lines. They did not go to the title company or assessor's office to look at a map of the property. They did not study the description in their deed. Rather, as to the western boundary, plaintiffs simply assumed that the chain-link fence marked the property line. When they bought Lot 802, plaintiffs were focused on the condition of the house and the garage and were not worried about the property lines.

From 1991 to 2014, plaintiffs used the disputed area as part of their front yard, without anyone saying anything.

In 2014, defendants bought Lot 800. They had the property surveyed and, as a result, learned that the existing chain-link fence did not run along the deeded property line, or at least not for its entire length. Starting at the northernmost point, the actual property line ran south for about three-quarters of the lot's length, and then turned southeasterly at a 45-degree angle, terminating at Yaquina Heights Drive. By contrast, the fence began on the property line, ran straight for most of the lot's length—bearing slightly but increasingly west of the property line, until, where the actual property line veered southeasterly, the fence continued straight and thus ran significantly west of the property line—until, nearing Yaquina Heights Drive, the fence curved westward to connect with defendants' driveway gate on Lot 800. The differential between the actual property line and the fence line—*i.e.*, the disputed area—is depicted on Exhibit 103:



Taylor drawing showing location of new fence and cyclone fence we removed.

Shortly after purchasing Lot 800, defendants removed the existing chain-link fence and built a new wooden fence along the deeded property line. That event spurred plaintiffs to file this action. Plaintiffs alleged that they had acquired title to the disputed area by adverse possession, asserting claims for adverse possession, ejectment, and damages for removal of the chain-link fence. Defendants opposed plaintiffs' claims. The parties filed cross-motions for summary

judgment, which the trial court denied. The case proceeded to trial. The adverse possession claim was tried to the court, with the understanding that, if plaintiffs prevailed, the other claims would be tried to a jury.

After hearing the evidence, the trial court concluded that plaintiffs had failed to prove the "honest belief" element of adverse possession. The court stated that, after plaintiffs had owned Lot 802 and used the disputed area as part of their front yard for a few years without anyone saying anything, it was "absolutely" reasonable for them to believe that the disputed area belonged to them—and even more so after that situation continued for 20 years. The court explained, however, that the key legal question was whether plaintiffs' belief had been reasonable "at the moment that [they] first obtained the deed and paid the money and signed the closing papers," because "that belief has to be there and be reasonable at the time that you first go onto the property as an owner."

As to what plaintiffs believed in 1991, the court seemed to express skepticism that plaintiffs' subjective belief, as described in their testimony, qualified as an honest belief of actual ownership within the meaning of ORS 105.620 (1)(b). But the court did not rule on that basis. Instead, it focused on the reasonableness requirement, concluding that any honest belief of actual ownership that plaintiffs had in 1991 was unreasonable under the particular circumstances. In the court's view, it would be "fair" for anyone standing on Lot 802 to look at the fence and think, "This piece of property might go to that fence," but it was not reasonable to look at the fence and think, "This property does go to that fence." The court viewed the evidence as showing that plaintiffs were "somewhat careless and maybe in the negligence range, if not reckless, in not being very careful about what the property lines were when they bought."

The trial court did not address any of the other elements of adverse possession. (Plaintiffs argue that the trial court implicitly ruled in their favor on the other elements of adverse possession. Having reviewed the record, we disagree.) The court entered judgment for defendants, dismissing plaintiffs' adverse possession claim, as well as their

derivative claims for ejectment and damages. Plaintiffs appeal. In their first assignment of error, they challenge the dismissal of their adverse possession claim after trial.[1] In their second assignment of error, they challenge the related dismissal of their ejectment and damages claims.

## ANALYSIS

### A. *General Principles (Adverse Possession)*

Until 1989, adverse possession was purely a common-law claim in Oregon. To prevail at common law, the claimant had to prove by clear and convincing evidence that the claimant or the claimant's predecessors in interest had maintained "actual, open, notorious, exclusive, hostile, and continuous possession of the property for ten years." *Tieu v. Morgan*, 246 Or App 364, 369, 265 P3d 98 (2011).

In 1989, the legislature codified the common-law elements of adverse possession, as well as added a new "honest belief" element applicable to all claims vesting after January 1, 1990. *Id.* at 369 n 4. The resulting statute, ORS 105.620, provides, in relevant part:

"A person may acquire fee simple title to real property by adverse possession only if:

"(a)  The person and the predecessors in interest of the person have maintained actual, open, notorious, exclusive, hostile and continuous possession of the property for a period of 10 years;

"(b)  At the time the person claiming by adverse possession or the person's predecessors in interest, first entered

---

[1] Defendants correctly point out that the opening brief is not fully compliant with ORAP 5.45(3), in that the first assignment of error mentions two rulings, rather than identifying with precision a single ruling that is being challenged. In context, however, it is sufficiently clear that plaintiffs are assigning error only to the trial court's dismissal of their adverse possession claim after trial. *See Village at North Pointe Condo. Assn. v. Bloedel Constr.*, 278 Or App 354, 359-61, 374 P3d 978, *adh'd to as modified on recons*, 281 Or App 322, 383 P3d 409 (2016) (recognizing the importance of compliance with ORAP 5.45, declining to review a claim of error where we were "unable to discern" which ruling the plaintiff sought to challenge, but reviewing a ruling that was sufficiently identified for our review). Plaintiffs also refer to an "erroneous" summary judgment ruling, but, in context, we do not understand them to seek appellate review of that ruling, which would be unreviewable in any event. *See Staten v. Steel*, 222 Or App 17, 26, 191 P3d 778 (2008) ("[T]he denial of a motion for summary judgment that is based on facts, even undisputed facts, is not reviewable.").

into possession of the property, the person entering into possession had the honest belief that the person was the actual owner of the property and that belief:

"(A)  By the person and the person's predecessor in interest, continued throughout the vesting period;

"(B)  Had an objective basis; and

"(C)  Was reasonable under the particular circumstances; and

"(c)  The person proves each of the elements set out in this section by clear and convincing evidence."

ORS 105.620(1).[2]

The "honest belief" element was added to remedy a perceived unfairness in the common law of adverse possession, whereby squatters and unscrupulous neighbors could obtain title to property that they knew belonged to others. *See* Tape Recording, Senate Committee on Judiciary, HB 3195, May 9, 1989, Tape 164, Side A (statement of Rep Larry Campbell) (stating that, "over the years, the courts have gradually moved toward making it easier for people to adversely possess land against honest land owners" and that the addition of the honest belief element "makes it perfectly clear to the judiciary that one of the main elements needed to prove adverse possession is that the adverse possessor has an honest belief that the property was his or hers and that they weren't trying to acquire the property unscrupulously"); Testimony, House Committee on Judiciary, Subcommittee on Civil Law and Judicial Administration, HB 3195, Apr 12, 1989, Ex E (statement of Eugene Grant, Chair of the Real Estate and Land Use Section of the Oregon State Bar) (describing the "honest belief" element as requiring "a good faith belief that the possessor is the owner of the property," thus preventing claims by squatters and unscrupulous neighbors).

---

[2] As to the requirement that the facts relevant to adverse possession be proved by clear and convincing evidence, we note that "clear and convincing evidence" is a standard of proof, "not a description of the credibility or believability of the evidence." *State of Oregon v. M. J. F.*, 306 Or App 544, 548, 473 P3d 1141 (2020). It requires that "'the truth of the facts asserted is highly probable.'" *Id.* (quoting *Cook v. Michael*, 214 Or 513, 527, 330 P2d 1026 (1958)).

Although a new requirement, the "honest belief" element overlaps with the traditional hostility element in a way that bears on our construction of the "honest belief" element, so we briefly discuss hostility. Other than the "honest belief" element, hostility is the only element of adverse possession that depends, at least sometimes, on the claimant's state of mind. "In the context of adverse possession, the term 'hostile' means that the claimant possessed the property intending to be its owner and not in subordination to the true owner." *Faulconer v. Williams*, 327 Or 381, 389, 964 P2d 246 (1998). Hostile possession may occur in either of two ways: "with color of title," or "under claim of right." ORS 105.620(2)(a) ("A person maintains 'hostile possession' of property if the possession is under claim of right or with color of title."). "Color of title" means that a person "claims under a written conveyance of the property or by operation of law from one claiming under a written conveyance." *Id.* "Claim of right" means a person subjectively intends to appropriate the land, to the exclusion of all others, regardless of whether he or she has title. *Hoffman v. Freeman Land & Timber, LLC*, 329 Or 554, 561, 994 P2d 106 (1999). For example, when a squatter purposefully occupies someone else's property in the hopes of acquiring title by adverse possession, that is hostile possession under claim of right.

To prove hostile possession under claim of right, a claimant normally must prove that he or she subjectively intended to possess the property as its owner, regardless of who held title. *Stiles v. Godsey*, 233 Or App 119, 127, 225 P3d 81 (2009). For at least 60 years, however, Oregon has recognized an exception for "pure mistake," *i.e.*, when the claimant had an honest but mistaken belief of ownership. *See Norgard et al v. Busher et ux*, 220 Or 297, 301, 349 P2d 490 (1960) (recognizing "pure mistake" doctrine); *Clark v. Ranchero Acres Water Co.*, 198 Or App 73, 80, 108 P3d 31 (2005) (describing the "exception" for "pure mistake" as involving an "honest but mistaken belief of ownership"). If a claimant occupies land under the mistaken belief that it is covered by his or her deed, a court will regard "[t]he intent derived directly from the physical senses, *i.e.*, the intent to claim the land actually occupied, * * * as overriding the less immediately effective intent to hold in conformity with the

deed." *Norgard*, 220 Or at 302 (internal quotation marks omitted). In such cases, the claimant's subjective intent to hold the land as its owner is *presumed*. *Hoffman*, 329 Or at 561 n 4.

But the "pure mistake" doctrine does not apply to a mistake based upon "conscious doubt." *Faulconer*, 327 Or at 390. If the claimant was "'aware of the possibility that he might be intruding upon his neighbor's land,'" the claimant must prove his or her subjective intent, rather than getting the benefit of a presumption. *Id*. (quoting *Norgard*, 220 Or at 302). The rationale for excluding cases of "conscious doubt" from the "pure mistake" doctrine is explained in *Norgard*:

> "Where an occupant of land is in doubt as to the location of the true line, it is reasonable to inquire as to his state of mind in occupying the land in dispute. If, having such doubt, it was his purpose to hold the disputed area only if that area was included in the land described in his deed, then it is reasonable to say that the requisite hostility is lacking. But, if the occupation of the strip is under a mistaken belief that it is included in the description in his deed (a state of mind sometimes described as 'pure mistake' to distinguish it from the cases of 'conscious doubt'), then his possession is adverse."

220 Or at 301.

In adopting the "honest belief" element, the legislature effectively narrowed the circumstances in which hostile possession may give rise to adverse possession. Under the common law, anyone possessing property with color of title or under claim of right could acquire title by adverse possession, so long as the possession was actual, open, notorious, exclusive, and continuous for 10 years. Under ORS 105.620, by contrast, only claimants possessing property with color of title or under claim of right *while holding an honest belief of actual ownership that began at the time of first possession, continued for 10 years, had an objective basis, and was reasonable under the particular circumstances* may acquire title by adverse possession, if the possession was also actual, open, notorious, exclusive, and continuous for 10 years.

Notably, the legislature did not eliminate the hostility element when it added the "honest belief" element. In

enacting ORS 105.620(2)(a), "the legislature intended the element of hostility to retain its common-law meaning." *Clark*, 198 Or App at 80. Nonetheless, the practical effect of the "honest belief" element is to render the hostility element superfluous in many cases, in that proof of the requisite "honest belief" will normally establish hostile possession under claim of right, by application of the pure-mistake doctrine. *See Stiles*, 233 Or App at 127-28 (suggesting same).

Given the historical context for adoption of the "honest belief" element, including pre-1989 hostility case law, we have taken the view that the 1989 legislature intended the "honest belief" required by ORS 105.620(1)(b) to be akin to the "mistaken belief" necessary to prove hostility by application of the pure-mistake doctrine. In *Stiles*, 233 Or App at 127-28, we described the "honest belief" element as requiring proof of the same kind of "honest mistake" as the common-law pure-mistake doctrine. After explaining that a claimant can prove hostile possession under claim of right by proving an "honest but mistaken belief of ownership"—but only if the mistake was a "pure mistake," not a "mistake based on conscious doubt"—we began our discussion of the "honest belief" element, stating, "ORS 105.620(1)(b) requires proof of *such an 'honest mistake'* to establish an adverse possession claim." *Id.* at 127 (emphasis added). And, in *Tieu*, 246 Or App at 372-73, where the defendants claimed an honest but mistaken belief of ownership, we analyzed the "honest belief" and hostility elements together.

B. *Application (Adverse Possession)*

With those principles in mind, we turn to the particulars of this case.

To prove the requisite "honest belief" for adverse possession, plaintiffs had to prove that (1) when they first entered into possession of the disputed property, they had the honest belief that they actually owned it; (2) that belief continued for 10 years; (3) that belief had an objective basis; and (4) that belief was reasonable under the particular circumstances. ORS 105.620(1)(b).

We address each aspect of the "honest belief" element in turn. Ultimately, whether a particular set of historical facts establishes an element of adverse possession presents a legal issue. *Sea River Properties, LLC v. Parks*, 355 Or 831, 855, 333 P3d 295 (2014) ("Whether [the] historical facts establish the elements of an adverse possession claim presents a legal issue."); *see also Hoffman*, 329 Or at 564 (treating as a question of law whether the historical facts as found were "significant enough" to establish hostile possession); *Manderscheid v. Dutton*, 193 Or App 9, 16, 88 P3d 281, *rev den*, 337 Or 247 (2004) (assessing "as a matter of law" whether "the parties' belief about the extent of the property that they purchased lacked an objective basis and was unreasonable").

1.  *Honest belief of actual ownership*

The first requirement for the "honest belief" element is that, when the claimants first entered into possession of the disputed property, they had the honest belief that they were the actual owners of the property. ORS 105.620 (1)(b). Here, the trial court declined to make a definitive ruling on that issue, instead focusing on the "reasonableness" of any belief that plaintiffs had.[3] As previously discussed, we have granted limited *de novo* review to discuss the "honest belief" element in its entirety, so we begin with the first requirement.

The only evidence at trial regarding plaintiffs' subjective belief in 1991 was their own testimony. According to that testimony, plaintiffs did not obtain a survey or look at any maps before purchasing Lot 802, and their realtor said nothing about the location of the property lines. Plaintiff Frank Wood testified that he always believed that the chain-link fence marked the western property line, based on the existence of the fence, the visible difference in yard maintenance, and the apparent shape of Lot 802. He described it as "just a no-brainer" that "there's your property line, there's

---

[3] Plaintiffs assert that the trial court ruled in their favor on this issue, but we agree with defendants that the court did not make a definitive ruling as to whether plaintiffs' subjective belief in 1991 qualified as an honest belief of actual ownership within the meaning of ORS 105.620(1)(b). If anything, the court expressed skepticism that it did.

the fence." When asked whether he knew in 1991 if the disputed area was part of his "deeded property," Frank Wood admitted that he "didn't know it in writing," because he "had never looked at" a deed, a map, or anything other than the fence itself. Plaintiff Peggy Wood gave similar testimony:

> "I saw the streets. I saw the fences. It was clear that their yard is over here on the other side of the fence. This yard is maintained this way or should I say lack of maintenance in this manner. It seemed obvious to me at the time that this was the property that we were purchasing. And honestly, I didn't think about it at the time or worry about where the boundaries were. It wasn't—That was not the most critical issue at hand."

Peggy Wood agreed that, "[i]n hindsight, you could say it was an assumption."

In *Tieu*, the owner of a large piece of property built a fence and, years later, in 1994, conveyed part of the property—Lot 3200—to his son, James, believing that the deed covered all land east of the fence. 246 Or App at 367. James "never specifically discussed the issue" with his father, but he too believed that Lot 3200 included all land east of the fence, because he had "no reason to know—to think [that the fence] would be in the wrong location." *Id.* (brackets in original). James later listed Lot 3200 for sale, advertising it as "fully fenced" and, in 1998, sold it to the defendants. *Id.* at 367-68. The lot was not surveyed as part of the 1998 sale, "nor did the parties to the sale discuss the lot's recorded boundaries, review paperwork or maps, or perform any investigation specifically related to that subject." *Id.* at 368. In 2006, the plaintiff bought from James's father the lot adjacent to Lot 3200, and a property-line dispute arose between the plaintiff and the defendants. *Id.* The defendants admitted that, until the dispute arose, they had "not given much thought to the property line's location." *Id.* at 372.

On that record, the trial court concluded on summary judgment that the defendants had proved as a matter of law that they had had an honest belief of actual ownership when they first came into possession of the disputed area, and we affirmed. *Id.* at 368-69, 373. Discussing the "honest

belief" and hostility elements together, we concluded that "the undisputed evidence establishe[d] clearly and convincingly that defendants and their predecessor, James, had an 'honest belief' that the disputed strip was part of lot 3200." *Id*. at 373. We rejected the plaintiff's argument that the defendants' admission to having not given much thought to the property line until the dispute arose was evidence that the defendants had a "conscious doubt" about whether the fence was actually located on the property line. *Id*. at 372. "Read in context," we explained, "those statements simply confirm defendants' *certainty* that the property line was the same as the fence line," rather than indicating that they had any conscious doubt as to the property line's location. *Id*. (emphasis in original).

By comparison, in *Mid-Valley Resources, Inc. v. Engelson*, the defendants claimed adverse possession of land adjacent to their deeded property, but the testimony of one of the defendants "clearly establishe[d] that she had conscious doubt as to where the property line was." 170 Or App 255, 261, 13 P3d 118 (2000), *rev den*, 332 Or 137 (2001). Specifically, the defendant testified during a perpetuation deposition that, "as a child living on the property she did not know where the boundary line to her parents' property was," although "she thought it was 'all ours,'" and, when she was asked if the fence was the western boundary, "she answered that she did not know." *Id*. Because that testimony established that the defendant "was in doubt as to the location of the true line," the defendants "[could] not rely on the pure mistake doctrine to satisfy the requirement of hostility." *Id*. The "honest belief" element was not at issue in *Mid-Valley Resources, Inc.*—due to the alleged vesting date of the claim, *see id.* at 259 n 2—but, as previously discussed, what constitutes a "pure mistake" versus a "conscious doubt" for hostility purposes is relevant to what constitutes an "honest belief" under ORS 105.620(1)(b).

Under existing case law, the line between unconscious assumption and conscious doubt can be a fine one. However, clarity about what constitutes a "pure mistake" (or "honest but mistaken belief") or an "honest belief," as distinct from a "conscious doubt," has become more important with the addition of the "honest belief" element. A claimant

who fails to prove a "pure mistake" for purposes of establishing hostility does not receive the benefit of a presumption but may still seek to prove that he or she had the requisite hostile intent. *See Norgard*, 220 Or at 301. By contrast, failure to prove the "honest belief" element is fatal to an adverse possession claim.

We therefore endeavor to be clear on this point. An "honest belief" refers to a good-faith belief of actual ownership, unaccompanied by any *conscious* awareness that the land might actually belong to the neighboring landowner. *See, e.g.*, *Norgard*, 220 Or at 301 (distinguishing "pure mistake" from "conscious doubt," and explaining that "[a]n inquiry into the actual intent of the possessor is appropriate only in those cases where it appears that the possessor was aware of the possibility that he might be intruding upon his neighbor's land" (internal quotation marks omitted)); *Agrons v. Strong*, 250 Or App 641, 649, 282 P3d 925 (2012) (the plaintiff established a "pure mistake," where he testified that, when he purchased his property, he did not see any survey maps but "believed" that he was purchasing "everything that was enclosed within the fence," and "no one had raised any doubt that the fence was the boundary line" until the present dispute); *see also Webster's Third New Int'l Dictionary* 482 (unabridged ed 2002) (defining "conscious" to mean, as relevant here, "perceiving, apprehending, or noticing *with a degree of controlled thought or observation*" (emphasis added)). An "honest belief" of actual ownership is also distinct from a conscious lack of knowledge as to the ownership of the land at issue. *See, e.g.*, *Mid-Valley Resources, Inc.*, 170 Or App at 261 (the defendant "did not know," as a child or as an adult, where the boundary lines were).

Thus, an "honest belief" within the meaning of ORS 105.620(1)(b) may be based on a mistaken assumption, so long as it is not accompanied by conscious doubt. That is what the evidence in this case shows. When plaintiffs bought Lot 802 in 1991, they assumed that the existing chain-link fence marked their western boundary, and they acted accordingly. They did not have any conscious doubt that the disputed area was part of their property. Like the defendants in *Tieu*, they never gave it much thought, because it never occurred to them to doubt it. The ability to recognize in hindsight that

one made an assumption—an assumption that later proved incorrect—does not change the historic fact of having had an honest belief based on that assumption.

Although the trial court did not rule definitively on the issue of plaintiffs' subjective belief, comments that it made about the evidence relevant to that issue warrant discussion. In particular, the court referred to "some evidence that [plaintiffs] may have believed that" they owned the disputed property, but also some "testimony that they didn't really know" and "that they even knew they didn't know," the coexistence of which the court characterized as Orwellian "double think." Based on those statements, this case would appear to be more like *Mid-Valley Resources, Inc.* than *Tieu*. However, upon review of the record, those characterizations are imprecise. The court may have been speaking somewhat loosely, given that it was more focused on the reasonableness requirement. In any event, upon review of the record, we find no evidence that would allow the trial court or us to find that defendants were consciously aware that they might be intruding on their neighbor's land or had consciously considered the possibility that the chain-link fence did not mark the western boundary of their property.

We therefore conclude that, much like James in *Tieu*, plaintiffs had an honest belief of actual ownership when they first entered into possession of the property.

### 2. *Continuation of belief for 10 years*

The second requirement for the "honest belief" element is that the claimants' subjective belief continued through the 10-year vesting period. ORS 105.620(1)(b)(A). Based on the trial court's discussion of the evidence, it is apparent that the trial court took the view—and arguably found as fact, expressly or implicitly—that whatever subjective belief plaintiffs had in 1991 continued undiminished, if not strengthened, until 2014. We agree. Plaintiffs therefore proved that their subjective belief continued through the vesting period.

### 3. *Objective basis for belief*

The third requirement for the "honest belief" element is that the claimants' subjective belief had an objective

basis. ORS 105.620(1)(b)(B). We have understood that to mean that a claimant's subjective belief of actual ownership must have some basis in *objective* fact. For example, in *Clark*, 198 Or App at 82, the plaintiffs' mistaken belief that they owned the disputed land had an "objective basis," where the prior owner had made a representation about the boundary line, the exclusive means of accessing the plaintiffs' garage was a driveway that ran across the disputed area, and the parties and their predecessors had acted in a manner consistent with the apparent boundary line. In *Manderscheid*, 193 Or App at 16, the plaintiffs' predecessors' mistaken belief had an "objective basis," where, prior to purchasing their property, they saw a continuous fence and a mobile home located inside the fenced-in area, and there were no external indicators that the lot was something other than the area enclosed by the fence.

Here, the trial court did not separately address the "objective basis" requirement, but we readily conclude that there was an objective basis for plaintiffs' subjective belief that they owned the disputed area. In particular, the existence of the chain-link fence and the physical conditions on either side of the fence were objective facts. Plaintiffs' subjective belief therefore had an "objective basis" within the meaning of the statute.

4. *Reasonableness under the particular circumstances*

The final requirement for the "honest belief" element is that the claimants' subjective belief of ownership was "reasonable under the particular circumstances." ORS 105.620(1)(b)(C). In this case, the trial court concluded that, if plaintiffs believed that they owned the disputed area when they first took possession in 1991, that subjective belief was not objectively reasonable. The trial court essentially adopted a due-diligence requirement in reaching that conclusion. In the trial court's view, plaintiffs were careless, negligent, or even reckless in assuming that the chain-link fence marked their western boundary, rather than taking affirmative steps to confirm the location of their boundaries. As the trial court put it, it would be "fair" for anyone standing on Lot 802 to look at the fence and think, "This piece of property might go to that fence," but it was not reasonable

to look at the fence and think, "This property does go to that fence." The trial court described the "takeaway" from this case as being that, "when you're buying a piece of property, use your words, ask around."

For purposes of ORS 105.620(1)(b)(C), "whether a mistaken belief [of actual ownership] is reasonable will depend on the circumstances of each case." *Clark*, 198 Or App at 83. We have previously identified several specific circumstances that may be relevant to reasonableness, including the size of the property in relation to the discrepancy, the nature of the land, the experience of the parties, and what the parties had been told. *Id.* (citing *Manderscheid*, 193 Or App at 16). We have also previously recognized that an accurate deed description "does not necessarily make a mistaken belief as to boundaries unreasonable." *Id.*

Plaintiffs argue that their mistaken belief that they owned the disputed area was objectively reasonable, given the situation on the ground in 1991. They point to the existing chain-link fence, which had the appearance of marking a boundary. They point to the contrasting physical conditions on each side of the fence—the grass to the west of the fence was maintained, consistent with the landscaping on Lot 800, whereas the grass to the east of the fence was in the same overgrown condition as the grass on Lot 802. They point to the fact that the fence gave Lot 802 the appearance of a roughly rectangular lot, which is a typical lot shape. And they point to the fact that the disputed area comprises only 10 to 15 percent of what they believed they owned. For those reasons, plaintiffs maintain that their mistaken belief of ownership was reasonable. They reject the notion that they had to take affirmative action to locate the deeded boundary lines—and receive affirmative misinformation— for their mistaken belief of ownership to be "reasonable" within the meaning of ORS 105.620(1)(b)(C).

Defendants take the opposite view, arguing that any subjective belief that plaintiffs held was objectively unreasonable. Defendants point to the fact that plaintiffs simply "assumed" that the chain-link fence marked the western boundary, without having the property surveyed, without looking at any maps, and without anyone ever telling them

that the fence marked the boundary. They point to the fact that the fence terminated at a gate post on defendants' driveway, rather than continuing all the way to the street, and to the very location of defendants' driveway as evidence that, visually, the fence did not make for a logical property line. They point to the fact that plaintiff Peggy Wood was a former residential real estate appraiser who knew, at least in theory, that fences are not always reliable, arguing that she "should have doubted the accuracy of the fence." They point to the correct legal description in plaintiffs' deed.[4]

We consider each of the circumstances identified by the parties, within the framework of the considerations identified as relevant in *Manderscheid* and other cases—that is, the size of the property in relation to the discrepancy, the nature of the land, the experience of the parties, and what the parties had been told.

The size of the property in relation to the discrepancy weighs in favor of reasonableness. The disputed area comprises 10 to 15 percent of what plaintiffs believed that they owned. For a flat lot in a rural residential area, that is a relatively small discrepancy. How large a discrepancy will render a belief unreasonable depends on the particular circumstances. In *Tieu*, 246 Or App at 372, the discrepancy consisted of a three-foot strip of land along the "flagpole" portion of a flag lot, which was a "small" discrepancy relative to the size of the lots. In *Stiles*, 233 Or App at 130, a 10-foot discrepancy along the property line was "small" in relation to the lot size. In *Manderscheid*, 193 Or App at 16, the discrepancy was much greater—the plaintiffs' deeded property was nine acres, and the disputed area was an additional five acres, so the disputed area made up over 35 percent of the total property that the plaintiffs believed that they owned; nonetheless, we concluded that, under the circumstances, "the difference between a 9-acre lot and a 14-acre lot [was] not great, given the uneven nature of the property, which made it difficult for anyone to determine precisely the size of the parcel."

---

[4] Defendants also make an argument about the fact that the well for Lot 802 was located on Lot 800. We reject that argument without written discussion.

Plaintiffs' belief was also reasonable given the nature of the land. The existence of a fence may contribute significantly to the reasonableness of a mistaken belief of ownership. *See Tieu*, 246 Or App at 372 (relying in part on existence of a fence to conclude that the claimants' mistaken belief of ownership was reasonable); *Manderscheid*, 193 Or App at 16 (same). Of course, fences may serve purposes other than marking property lines, so the significance of any given fence will depend on what it communicates under the particular circumstances. *Cf. Nooteboom v. Bulson*, 153 Or App 361, 365, 956 P2d 1042, *rev den*, 327 Or 431 (1998) (stating, in a different context, that "the significance of a fence and of its state of repair in any particular case depends on the character of the land and what the fence communicates to others about possession of the disputed property"); *e.g.*, *Whitley v. Jacobs*, 278 Or 541, 548, 564 P2d 1057 (1977) (discussing an old fence of "irregular character, running as it did in a rough half-circle," that "could not have been intended as a boundary fence" but, instead, was clearly a convenience fence meant to assist in the management of cattle). When a fence is placed in such a manner as to suggest that it marks a property boundary, however, it is reasonable to believe that that is its purpose.

Other physical characteristics of the land may then strengthen or weaken the reasonableness of that belief. Here, when plaintiffs purchased Lot 802, the disputed area was in the same unkempt condition as Lot 802, while Lot 800 was well maintained. That additional circumstance made it more reasonable for plaintiffs to believe that the fence marked the property line and had been treated as such. Moreover, there were no external indicators that the fence was misplaced or that it was meant to serve some purpose other than marking the property line.[5]

As for the shape of the lot, that aspect of the land neither made plaintiffs' belief more reasonable (as plaintiffs

---

[5] By contrast, in *Stiles*, 233 Or App at 124, the claimant failed to prove adverse possession of the riverfront portion of disputed property, even though he proved adverse possession of the non-riverfront portion, because it was not reasonable for him to believe that he owned the riverfront portion, which was different in character from the rest of his property and, unlike the rest of the disputed area, not fenced.

argue), nor made it unreasonable (as defendants argue). As plaintiffs point out, Lot 802 is more rectangular with the disputed area than without it, which could make plaintiffs' mistaken belief of ownership more reasonable. However, as defendants point out, Lot 802 is not perfectly rectangular even with the disputed area, and plaintiffs have never claimed to have believed that their western boundary ran straight for its entire length, including past the end of the fence and through defendants' driveway. Under the circumstances, we disagree with plaintiffs that the apparent shape of Lot 802 added significantly to the reasonableness of their belief. At the same time, we disagree with defendants that the fence curving and then terminating at their gate, instead of Yaquina Heights Drive, made it unreasonable to rely on the fence at all.[6] As we said in *Tieu*, "a fence's existence can support an adverse-possession claim even if the fence does not completely separate disputed property from other land. Instead, what matters is whether the partial fencing serves to visibly delineate the claimed area by indicating how it is set off from other property." 246 Or App at 370. In the end, the shape of the lot is a neutral factor in terms of the reasonableness of plaintiffs' belief.

Next is the experience of the parties. Plaintiffs argue that, to the extent that the trial court relied on Frank Wood's work as a contractor or Peggy Wood's former work as a real estate appraiser, that was error, because there is no evidence that either party had experience relevant to the issue at hand. Given what the trial court said in ruling, we do not understand the trial court to have relied on either plaintiff's work experience in concluding that it was unreasonable for plaintiffs to believe that the fence marked the property line. We also agree with plaintiffs that, on this record, Frank Wood's experience as a contractor is not relevant to the reasonableness of his belief. As for Peggy Wood, defendants argue that she "should have doubted the accuracy of the fence," because, as an appraiser, she relied

---

[6] Defendants make several related arguments as to why the chain-link fence did not logically look like a boundary line. We describe those arguments summarily in the text, but we have considered each of them, and we are unpersuaded that the fence did not look like a boundary marker, up to the point where the fence terminated at defendants' gate.

on documents rather than fences to determine property boundaries. Plaintiffs disagree that Peggy Wood's appraisal experience is relevant, pointing to her testimony that she had never done an appraisal that required a survey or that involved a fence located off the property line. Ultimately, we view Peggy Wood's work experience as potentially relevant, but, on this record, it did not make her mistaken belief of ownership unreasonable, especially when she had no actual prior experience of a fence being located off the property line.

The last relevant circumstance is what the parties had been told. In assessing the reasonableness of a belief of ownership, an affirmative misrepresentation about the location of a property line can make a mistaken belief of ownership more reasonable. In *Stiles*, 233 Or App at 130, for example, the previous owner's description of the property boundaries to the claimant at the time of sale—the accuracy of which the claimant "had no reason to question"—was one relevant circumstance in concluding that the claimant's mistaken belief of ownership was reasonable. But it does not follow that the absence of an affirmative misrepresentation makes a mistaken belief of ownership unreasonable. We disagree with the trial court that, under ORS 105.620 (1)(b)(C), a mistaken belief of ownership is reasonable only if the claimants took affirmative steps to locate their deeded property lines but were given misinformation.

Requiring affirmative misinformation for an honest belief to be reasonable would be inconsistent with existing case law. In *Manderscheid*, the plaintiffs claimed ownership of disputed property based entirely on their predecessors' adverse possession. 193 Or App at 13-15. The predecessors' mistaken belief of ownership was based solely on their having viewed a continuous fence, with a mobile home located within the fenced area, on the property prior to purchasing it. *Id.* at 11-12. Unbeknownst to them, the property line actually ran through the site of the mobile home. *Id.* We affirmed the trial court's ruling for plaintiffs on their adverse possession claim, including holding that their predecessors' honest but mistaken belief of ownership was reasonable. *Id.* at 16.

In *Tieu*, the defendants' adverse possession claim required tacking their own possession of the disputed property to their predecessor James's possession to achieve the necessary 10-year vesting period. 246 Or App at 370 (relying on two to four years of James's possession). The defendants therefore had to prove—and did prove—that both they *and* James had the requisite "honest belief" for adverse possession. *Id.* at 373 (concluding that the evidence established that both the "defendants and their predecessor, James, had an 'honest belief' that the disputed strip was part of lot 3200"). The defendants' reasonable belief was based on the fence that they saw when they bought the property, which appeared to mark the property line, and James's advertisement of the property as "fully fenced." *Id.* at 367, 370. However, James' mistaken belief, which was also reasonable, was based solely on the location of the existing fence and his having "no reason to know—to think [that the fence] would be in the wrong location." *Id.* at 367.[7]

Under existing case law, then, although a previous owner's misstatement about the location of a property line certainly may contribute to the reasonableness of a claimant's honest but mistaken belief of ownership, such a misstatement is not *necessary* for reasonableness. To the contrary, as *Manderscheid* and *Tieu* demonstrate, an honest but mistaken belief of ownership may be "reasonable" based solely on the existence of a fence that appears to mark the property line, at least absent external indicators that the fence was not meant to mark the property line or is not actually on the property line.

That leaves plaintiffs' deed, which may be fairly characterized as something that plaintiffs were told. As both

---

[7] *Clark* involved a similar situation as *Tieu*. In *Clark*, wherein the plaintiffs also relied on tacking to establish adverse possession, we concluded that the plaintiffs' predecessor, Bill Clark, had had an honest belief of ownership that was reasonable under the circumstances, where, upon purchasing his property, he had "assumed, based on the physical appearance of the property, that the fence and ditch line was the southern boundary." 198 Or App at 76. The only difference in *Clark* was that, "shortly *after*" Bill Clark purchased his property, he was told by his own predecessor that the property ran to the fence and ditch line. *Id*. (emphasis added). Neither we nor the parties appear to have focused on the timing issue in *Clark*, but it bears repeating that ORS 105.620(1)(b) requires that the honest belief exist "[a]t the time the person claiming by adverse possession or the person's predecessors in interest, first entered into possession of the property."

parties acknowledge, the fact that an adverse possession claimant's deed accurately described the claimant's property is not dispositive of whether an honest but mistaken belief of ownership was reasonable. *Clark*, 198 Or App at 83; *Manderscheid*, 193 Or App at 16. Rather, "whether a mistaken belief is reasonable will depend on the circumstances of each case," such as "the size of the property in relation to the discrepancy, the nature of the land, the experience of the parties, and what [the claimant] had been told." *Clark*, 198 Or App at 83. Here, defendants argue that, if plaintiffs had studied their deed, they could have discerned a discrepancy between the legal description of the western boundary and the location of the fence.

Even assuming the appropriateness of scrutinizing a deed to assess its comprehensibility to someone not versed in the technical language of legal descriptions of real property—something that we have not done in other "honest belief" cases—and even assuming that plaintiffs would have been able to discern a discrepancy if they had studied their deed closely enough—a debatable point—the fact remains that plaintiffs never in fact studied their deed. Moreover, under the particular circumstances of this case, we are unpersuaded that plaintiffs' failure to study their deed made their mistaken belief about the property line unreasonable. As in *Clark* and *Manderscheid*, the reasonableness of plaintiffs' belief was not dependent on the accuracy of their deed.

On the whole, considering all of the particular circumstances, it was reasonable for plaintiffs to believe, when they first came into possession of the disputed area, that it was part of their property. In particular, it was reasonable for plaintiffs to have that belief given the nature of the land and the size of the property in relation to the discrepancy. The experience of the parties did not make plaintiffs' belief less reasonable on this record. And, although plaintiffs were not told anything that made their belief more reasonable, neither were they told anything that made it less reasonable. Plaintiffs' mistaken belief in this case was as reasonable as the mistaken beliefs of the claimants and their predecessors in *Tieu*, *Manderscheid*, and *Clark*.

C.   *Disposition*

Having concluded that plaintiffs proved the "honest belief" element of adverse possession, we reverse the dismissal of plaintiffs' adverse possession claim and remand to the trial court to decide whether plaintiffs proved the other elements of adverse possession—that is, actual, open, notorious, exclusive, hostile, and continuous possession of the disputed property for 10 years. We also reverse the dismissal of plaintiffs' ejectment and damages claims (the subject of plaintiffs' second assignment of error). The ejectment and damages claims were dismissed without trial, because they were dependent on plaintiffs successfully proving adverse possession in a bifurcated trial. As the adverse possession claim is now live again, so are those claims. Finally, because we reverse the general judgment, we also reverse the supplemental judgment for costs and disbursements. *See* ORS 20.220(3)(a) ("If the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be reversed.").

General judgment reversed and remanded; supplemental judgment reversed.